

USCHER, QUIAT, USCHER & RUSSO
A Professional Corporation
433 Hackensack Avenue, 2nd Floor
Hackensack, NJ 07601
201-342-7100
Attorneys for Plaintiff
Edward A. Friedman

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDWARD A. FRIEDMAN, | Civil Action No. |
| Plaintiff, | |
| vs. | COMPLAINT |
| PRUDENTIAL INSURANCE COMPANY OF AMERICA, | ECF CASE |
| Defendants. | |

Plaintiff, EDWARD A. FRIEDMAN, residing at 4 East 89th Street, Apt. 4-G, New York, New York 10128, by way of Complaint against the Defendant alleges as follows:

1. Plaintiff is a resident of the State of New York, County of New York, with a principal residence at 4 East 89th Street, Apt. 4-G, New York, New York 10128.

2. Defendant, Prudential Insurance Company of America (hereinafter alternatively referred to as "Defendant" or "Prudential"), is an insurance company organized and existing under the laws of the United States, with a principal place of

business at 290 West Mount Pleasant Avenue, Livingston, New Jersey 07039 and is authorized to do business in the State of New York.

3. Jurisdiction and venue are proper in this Court pursuant to 29 USC § 1001 *et. seq.*, 28 USC § 1331 *et. seq.* and 28 USC § 1391 *et seq.*

## *Essential Facts*

4. Edward Friedman is a 47-year-old real estate professional who was engaged until disability in the high-powered world of New York based international real estate transactions. He is a graduate of Columbia University and Columbia Law School. At Newmark Knight Frank ("Newmark"), where Mr. Friedman was Executive Vice President in charge of Global Brokerage and Advisory Services, he earned a base salary of $275,000.00 per year, plus incentive compensation which paid him almost $500,000.00 per year. He had recently become an equity partner in the firm and stood to realize millions of dollars in ownership interest as the company continued to expand.

5. Under Prudential Group Disability Policy No. 90754 issued to Newmark (see attached as **Exhibit A**), Mr. Friedman is insured for his inability to "perform the material and substantial duties of his regular occupation due to sickness or injury".

6. Mr. Friedman's job required grueling hours, significant stress and substantial travel. He would report to his office by 7:00 a.m., and to leave the office at approximately 8:00 p.m. On average, he conducted 50 to 60 telephone calls a day and addressed 175 to 200 email messages per day.

7. In addition, he was responsible for reviewing incoming correspondence, drafting outgoing correspondence, monitoring market capture rate percentage numbers

throughout the day, monitoring competitors' performance, attending 3 - 6 unscheduled meetings per day. He was also responsible for reviewing financially complex commercial real estate contract proposals, drafting and editing proposals, and supervising and generating performance assessments of all subordinate brokers. In addition, Mr. Friedman proposed, negotiated and executed partnership agreements on behalf of Newmark with dozens of international and domestic concerns; prepared and presented at senior broker meetings; testified on behalf of Newmark in pending real estate litigation, and supervised hundreds of employees who reported to him.

8. His travel requirements were substantial. He spent approximately 1 week per month out of his office, outside the New York Metropolitan area, meeting with clients, affiliates and scouting for business opportunities and new talent.

9. On average, Mr. Friedman worked 80 hours per week, and was typically on call 24 hours a day, 7 days a week, until he became totally disabled in August of 2006.

### *Mr. Friedman's Disability*

10. Numerous medical conditions, in combination, have totally disabled Mr. Friedman effective August 6, 2006.

11. Mr. Friedman has been diagnosed with progressively worsening Dysautonomia. Dysautonomia refers to a disorder of Autonomic Nervous System (ANS) function. Most physicians view Dysautonomia in terms of failure of the sympathetic or parasympathetic components of the ANS, but Dysautonomia involving excessive ANS activities also can occur. Dysautonomia can be local, as in Reflex Sympathetic

Dystrophy, or generalized, as in pure autonomic failure. Dysautonomia is an umbrella condition which explains a host of varied and disparate medical problems.

12. Common manifestations of Dysautonomia include Neurocardiogenic Syncope, Inappropriate Sinus Tachycardia (IST), and Irritable Bowel Syndrome (IBS).

13. Symptoms of Dysautonomia include frequent aches and pains, faintness (or even actual fainting spells), extreme fatigue and inertia, Tachycardia, Hypotension, poor exercise tolerance, sleep disturbances, gastrointestinal symptoms such as Irritable Bowel Syndrome, sweating, dizziness, blurred vision, numbness and tingling.

14. Unfortunately, there is no cure for Dysautonomia. The best the medical profession can do in this circumstance is to treat the many different medical problems which emanate from Dysautonomia and to attempt to maintain a vaguely normal quality of life for patients suffering from this severe condition.

15. Mr. Friedman also suffers from Inappropriate Sinus Tachycardia since at least 2002, a chronic condition in which the patient's heart rate gets "stuck" in a dangerously elevated state, without reason or notice. Indeed, Dr. Steven Zweibel has been treating Mr. Friedman for this condition since November of 2001, at which point he began Mr. Friedman on a beta-blocker Toprol, after performing a stress test on Mr. Friedman in December of 2001. The initial Toprol dosage was 25-50 mg. daily. Since that time, the medical history reflects that Mr. Friedman's condition has continued to deteriorate and that Mr. Friedman is currently taking 350 mg. of Toprol daily - - a massive dose by any estimate - - just to stay alive.

16. Even in lower doses, beta-blockers like Toprol are well documented in the medical literature to cause severe and debilitating fatigue, mental confusion, short term memory loss, and Syncope. Toprol is also widely known to cause gastrointestinal disorders, including ulcerative colitis and chronic diarrhea.

17. By the summer of 2006, Mr. Friedman's seriously deteriorating medical condition, and the heavy doses of Toprol he ingested daily to survive, were making it impossible for him to meet the demands of his high powered position at Newmark. As a result, Mr. Friedman was forced to apply for long term disability benefits under Newmark's Prudential Policy No. 90754, effective August 6, 2006.

18. On November 29, 2006 Prudential denied Mr. Friedman's claim for long term disability benefits under Group Policy No. 90754. Prudential contended that "there is no medical documentation to support your inability to perform your own occupation."

19. On May 31, 2007, Mr. Friedman availed himself of his administrative remedies and filed an exhaustive administrative appeal of the denial of long term disability benefits.

20. Notwithstanding, Defendant Prudential ultimately issued a final decision on the administrative appeal on August 28, 2007, which upheld the prior denial of benefits.

21. Such a denial was wrongful and without basis in law or fact. The denial was against the substantial weight of the evidence in the administrative record and was arbitrary and capricious. As such, this Court must overturn the denial of benefits.

22. Plaintiff Friedman is disabled within the meaning of the terms of the Newmark Long Term Disability Plan, which is underwritten and administered by the

Defendant Prudential, which acts in a fiduciary capacity; as such, Mr. Friedman is entitled to total disability benefits thereunder.

23. The decision to deny benefits in this case does not meet the "substantial evidence" requirement in this circuit, and constitutes a breach of fiduciary duty by Prudential. Prudential failed to properly investigate Mr. Friedman's claim, failed to consider his treating physician's opinions and failed to even have Mr. Friedman attend an Independent Medical Exam. There is *no* evidence, let alone "substantial evidence" to justify Prudential's determination in this case. Prudential's medical evidence consists of a cursory "records review" by a hired insurance defense expert, who is not an expert in this field of medicine, and who never even met Mr. Friedman. In contrast, Mr. Friedman's treating physicians are world-renowned experts in this field who have had the benefit of repeated clinical examinations and regular direct contact with the patient himself. Significantly, Prudential has never contested Mr. Friedman's diagnosis of Dysautonomia, nor the contention that this incurable disease can and does disable Mr. Friedman. Rather than contest the diagnosis, Prudential chose to ignore it.

24. Further, Prudential completely failed to consider the devastating impact which his required daily ingestion of massive doses of beta-blockers has had on his already seriously impaired functionability. Disability can be established solely as the result of side effects from necessary medications. Here again, Prudential chose to ignore the evidence, which now stands unrebutted.

25. Finally, Prudential failed to consider Mr. Friedman's own subjective complaints, choosing to focus on only what it found lacking in the evidence, and ignoring

the compelling evidence of disability from Mr. Friedman himself. In this Circuit, it is well established that the subjective complaints of a claimant must be considered and, absent evidence to the contrary, must be credited.

26. Prudential also failed to consider or rebut the detailed factual allegations provided by third parties who witnessed Mr. Friedman's steady and shocking decline in health. Here again, these critical facts stand unrebutted in the record.

27. Mr. Friedman's long term disability benefits under this policy will pay him only a small fraction of what he was already earning, and would in the future have earned at Newmark. Hence, not only is there completely lacking any evidence of secondary gain by Mr. Friedman, but in fact, he has every financial incentive to *avoid* disability and continue to earn at his prior substantial rate at Newmark.

28. Hence, after years of hard work and enormous commitment, Mr. Friedman's bright and promising career has been shattered by severe, chronic illness, over which he has virtually no control. Adding insult to injury, Prudential has refused to honor its contractual and fiduciary obligations to Mr. Friedman, leaving him totally debilitated physically, and in a precarious and vulnerable financial position.

29. The decision of Prudential to deny the long term disability benefits to Mr. Friedman was arbitrary and capricious, not based on substantial evidence, and cannot stand.

30. By virtue of the foregoing the Defendant Prudential has breached the terms of the Newmark Employee Benefit Plan, of which Plaintiff Friedman is a beneficiary, and

has violated the requirements of the Employee Retirement Income Security Act, 29 USC § 1132 *et. seq.*, and applicable regulations promulgated thereunder.

WHEREFORE, Plaintiff demands that this Honorable Court enter an Order as follows:

1. Declaring Plaintiff totally disabled within the meaning of the Newmark's Prudential Group Disability Policy No. 90754;

2. Ordering Defendant to immediately place the Plaintiff on claim for total disability under the terms of the policy, retroactive to August 6, 2006;

3. Awarding to Plaintiff his cost of suit including reasonable attorney's fees;

4. Awarding to Plaintiff interest on all unpaid benefits;

5. Waiving any and all premium charges accruing with respect to the said policy of insurance;

6. Granting such other and further relief as this Court may deem just and proper.

>
> USCHER, QUIAT, USCHER & RUSSO
> A Professional Corporation
> 433 Hackensack Avenue, 2nd Floor
> Hackensack, NJ 07601
> 201-342-7100
> Attorneys for Plaintiff
> Edward A. Friedman
>
> By: _____
>      MICHAEL E. QUIAT

Dated: 10/29/07

G:\Disability\Friedman\Complaint USDC.doc

8