USCHER, QUIAT, USCHER & RUSSO
A Professional Corporation
433 Hackensack Avenue, 2nd Floor
Hackensack, NJ 07601
201-342-7100
**ATTORNEYS FOR PLAINTIFF**
**EDWARD A. FRIEDMAN**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| EDWARD A. FRIEDMAN, | Civil Action No. 07cv9620-SHS-AJP |
| Plaintiff, | |
| - against - | ECF CASE |
| PRUDENTIAL INSURANCE COMPANY OF AMERICA, | |
| Defendant. | |

---

**PLAINTIFF'S MEMORANDUM OF LAW
IN SUPPORT OF HIS MOTION FOR SUMMARY JUDGMENT**

On the Brief:

MICHAEL E. QUIAT

# **TABLE OF CONTENTS**

Page

CASES CITED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii, iii, iv, v

STATUTES CITED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

RULES CITED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vii

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

POINT I  -    PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT
              UNDER RULE 56 FED. R. CIV. PRO. AND CASES
              DECIDED THEREUNDER . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

POINT II  -   THE DENIAL OF BENEFITS TO PLAINTIFF WAS
              ARBITRARY AND CAPRICIOUS . . . . . . . . . . . . . . . . . . . . . . . 15

POINT III -   PLAINTIFF WAS DENIED A FULL AND FAIR REVIEW . . . . . 23

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

## CASES CITED

Page

*Abram v. Cargill*
    395 F. 3d 882 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20, 30

*Adickes v. S.H. Kress & Co.*
    398 U.S. 144, 157 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

*Aetna Health Insurance, Inc. v. Davila*
    542 U.S. 200 (2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

*Anderson v. Liberty Lobby, Inc.*
    477 U.S. 242, 248 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

*Atkins v. Park Place Entertainment Corp.*
    2008 WL 820040 (E.D.N.Y. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

*Ballone v. Eastman Kodak Co.*
    109 F. 3d 117, 124 (2d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

*Black & Decker Disability Plan v. Nord*
    538 U.S. 822, 833 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19, 23, 28

*Bryant v. Maffucci*
    923 F. 2d 979, 982 (2d Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

*Castro v. Metro. Transp. Auth.*
    No. 04 CV 1445, 2006 WL 1418585 at *2 (S.D.N.Y. May 23, 2006) . . .  14

*Cejaj v. Building Service 32B-J Health Fund*
    2004 WL 414834 (S.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23, 27

*Celotex Corp. v. Catrett*
    477 U.S. 317, 322-23 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

*Connors v. Connecticut General Life Insurance Company*
    272 F. 3d 127, 136 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  29

*DeDios Cortes v. MetLife, Inc.*
    122 F. Sup. 2d 121 (D.P.R. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

*Devlin v. Empire Blue Cross & Blue Shield*
    274 F. 3d 76 (2d Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21

_Donovan v. Bierwirth_
  680 F. 2d 263 (2d Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  21, 22

_Dzidzovic v. Building Service 32B-J Health Fund_
  2006 WL 2266501 (S.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

_Eastman Kodak Company v. Coyne_
  452 F. 3d 215, 221 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  23

_Firestone Tire & Rubber Co. v. Bruch_
  489 U.S. 101, 115 (1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

_Gaither v. Aetna Life Insurance Company_
  394 F. 3d 792, 806 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 29

_Giraldo v. Building Service 32B-J Pension Fund_
  2006 WL 380455 (S.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  27

_Goenaga v. March of Dimes Birth Defects Found_
  51 F. 3d 14, 18 (2d Cir 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

_Kinstler v. First Reliance Standard Life Insurance Company_
  181 F. 3d 243 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

_Loker v. Unum Life Insurance Company of America_
  389 F. 3d 288, 293 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  15

_McPherson v. N.Y. City Dep't. of Educ._
  457 F. 3d 211, 215 n. 4 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

_Meely v. Pension Trust of the Pension Hospitalization and
Benefit Plan of the Electrical Industry_
  2004 WL 2851792 (E.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

_Miller v. United Welfare Fund_
  72 F. 3d 1066, 1070 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

_Mitchell v. Eastman Kodak Co._
  133 F. 3d 433 (3d Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  20

_Moon v. Unum Provident Corporation_
  405 F. 3d 373 (6th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  25

_Morasco v. Bridgestone Firestone, Inc._
  2006 WL 354980 (E.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  24

_Muller v. First Unum Life Ins. Co._
　341 F. 3d 119, 123-24 (2d Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

_New England Health Care Employees Union v. NLRB_
　448 F. 3d 189 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

_Nickels v. Prudential Insurance Company of America_
　406 F. 3d 98, 108 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

_Pagan v. NYNEX Pension Plan_
　52 F. 3d 438, 442 (2d Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14, 15, 16

_Peterson v. Continental Casualty Company_
　77 F. Supp. 2d 420, 426-428 (S.D.N.Y. 1999) . . . . . . . . . . . . . . . . . . . . . 26

_Pulvers v. First Unum Life Insurance Company_
　210 F. 3d 89 (2d Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

_Quigley v. Unum Life Insurance Company of America_
　340 F. Sup. 2d 215, 223 (D. Conn. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 19

_Rappa v. Connecticut General Life Ins. Co._
　2007 WL 4373949 (E.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 28

_Segal v. City of New York_
　459 F. 3d 207, 211 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

_Servos v. Verizon New York, Inc._
　277 F. 3d 65 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

_Spangler v. Lockheed Martin Energy Systems_
　313 F. 3d 356 (6th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

_Stup v. Unum Life Insurance Company_
　390 F. 3d 301, 309 Note 5 (4th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . 19

_Tocker v. Phillip Morris Company, Inc._
　470 F. 3d 481, 487 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

_Torgeson v. Unum Life Insurance Company of America_
　466 F. Supp. 2d 1096 (N.D.I. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

_Torres v. Unum Life Insurance Company of America_
　405 F. 3d 670, 678 (8th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 28

*Tufariello v. Long Island R.R. Co.*
 458 F. 3d 80, 85 (2d Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

*Viglietta v. Metropolitan Life Insurance Company*
 2005 WL 5253336 (S.D.N.Y.) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Westinghouse Elec. Corp. v. N.Y. City Transit Auth.*
 735 F. Supp. 1205, 1212 (S.D.N.Y. 1990) . . . . . . . . . . . . . . . . . . . . . . . 14

*Zervos v. Verizon N.Y., Inc.*
 277 F. 3d 635, 648 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

*Zuckerbrod v. Phoenix Mutual Life Ins. Co.*
 78 F. 3d 46, 51 No. 4 (3d Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## SECONDARY SOURCES

*Re: Statement of Trust Second*
 Section 170 (1959) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*II Scott on Trusts*
 Section 170, 1297 to 1299 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Bogert, The Law of Trusts and Trustees*
 Section 543 (2nd Edition 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

## STATUTES CITED

Page

29 USC § 1132 (a)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

29 C.F.R. § 2560.503-1(h)(2)(ii)-(iii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

29 C.F.R. § 2560.503-1(h)(2)(iv) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

29 C.F.R. § 2560.503-1(h)(3)(iv) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

# **RULES OF COURT**

<u>Page</u>

Fed. R. Civ. Pro. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## STATEMENT OF FACTS

Edward Friedman is a 48-year-old real estate professional who was engaged, until disability, in the high-powered world of New York based international commercial real estate transactions. He is a graduate of Columbia University and Columbia Law School. At Newmark Knight Frank (formerly Newmark & Company Real Estate, Inc.), where Mr. Friedman was Executive Vice President in charge of Global Brokerage and Advisory Services, he earned a base salary of $275,000.00 per year, plus incentive compensation which paid him almost $500,000.00 per year. He had recently become an equity partner in the firm and stood to realize millions of dollars in ownership interest as the company continued to expand. Mr. Friedman's job required grueling hours, significant stress and exhausting travel requirements.

Under Newmark's Long Term Disability Plan, administered by Prudential and insured by Prudential Policy No. DG-90754-NY, Mr. Friedman is insured for his inability to "perform the material and substantial duties of his regular occupation due to sickness or injury".

### *Dysautonomia*

In March 2007, after a sharp and serious decline in his health, Mr. Friedman was diagnosed with progressively worsening Dysautonomia. Dysautonomia refers to a disorder of the Autonomic Nervous System (ANS) function. The Autonomic Nervous System is akin to an internal control panel which regulates all of the essential internal operating functions of the human nervous system. Dysautonomia renders the ANS dysfunctional, so essential control of systems like heart rate and bowel functions is lost. Dysautonomia is an incurable, progressive disease, similar to Multiple Sclerosis, in that it can affect many different systems simultaneously, or just an isolated system. Symptoms

1

may be worse some days than others, or may vary from system to system without notice or explanation (AR P00596 – AR P00600, AR P00587 – AR P00593, AR P00594 – AR P00595).

In Mr. Friedman's case, Dysautonomia has caused him chronic Neurocardiogenic Syncope, Inappropriate Sinus Tachycardia (IST), Irritable Bowel Syndrome (IBS), uncontrolled Diarrhea, Ulcerative Colitis, Sleep Apnea, Glaucoma and Advanced Thyroid Disease (AR P00596, P00602)[1].

Since there is no effective treatment for Dysautonomia, the best the medical profession can do is to treat the many different medical problems which emanate from Dysautonomia and to attempt to maintain a vaguely normal quality of life for patients suffering from this severe condition (AR P00594, P50098, P00602.) The Administrative Record in this case is replete with the massive, unrebutted medical evidence reflecting Mr. Friedman's pervasive and debilitating medical problems.

### *Inappropriate Sinus Tachycardia*

The first manifestation of symptoms experienced by Mr. Friedman occurred in approximately 2002, where he began to experience Inappropriate Sinus Tachycardia, a chronic condition in which the patient's heart rate gets "stuck" in a dangerously elevated state, without reason or notice. Indeed, Dr. Steven Zweibel, who has been Mr. Friedman's treating Cardiologist, and is a world renowned electrophysiologist, first began to treat this condition when he put Mr. Friedman on a beta-blocker Toprol, after performing a stress test on Mr. Friedman in December of 2001. The initial Toprol dosage was 25-50 mg. daily. Since that time, the medical record reflects that Mr. Friedman's

---

[1] References to the Administrative Record shall be designated by the prefix "AR P" followed by the specific Bates Stamp number of each cited page.

condition has continued to deteriorate and that Mr. Friedman is currently taking 350 mg. of Toprol daily - - a massive dose by any estimate - - just to stay alive (AR P00603).

Even in lower doses, beta-blockers like Toprol are well documented in the medical literature to cause severe fatigue, mental confusion, short term memory loss, and Syncope.   www.rxlist.com *Metoprolol Succinate ER*.   Toprol is also widely known to cause gastrointestinal disorders, including Ulcerative Colitis and chronic Diarrhea.   (Id.) www.pdrhealth.com (*Lopressor-Toprol-XL*).

In this case, Toprol has been helpful in controlling the Inappropriate Sinus Tachycardia, but with severe side effects to Mr. Friedman.  Mr. Friedman's long time primary care physician Gerald Bahr, M.D., explains:

> "The side effects that have plagued Ed, most especially in the last 24 months, include lightheadedness, dizziness, shortness of breath with minimal exertion, and extreme fatigue.  In my opinion, the high dosage of Toprol-XL ingested by Ed each day, now at the rate of 350 mg. each day, is likely to be a primary cause of each of these disabling symptoms.  **Unfortunately for Ed, he must continue to ingest Toprol-XL in these doses in order to survive**." (Emphasis added.)

Similarly Dr. Steven Zwiebel, Mr. Friedman's treating cardiologist who prescribed the Toprol for him, opined on the impact of Toprol on his condition:

> "Mr. Friedman is clearly disabled by Near-Syncope and Inappropriate Sinus Tachycardia - - both of which are the likely result of an underlying condition of Dysautonomia. He is further disabled by the side effects of the varying medication he ingests in an effort to manage his Inappropriate Sinus Tachycardia."

(AR P00616).

3

Finally Dr. Mark Gardenswartz, who began treating Mr. Friedman in March of 2007 and has definitively diagnosed him with Dysautonomia, has this to say about Mr. Friedman's condition:

> "There is no cure for Dysautonomia. This condition can be quite debilitating, particularly in a case like Ed Friedman's, where his occupation required extraordinary energy, drive and cognitive facility at all times.
> ***
> Given the symptoms so frequently experienced by Mr. Friedman, accurately documented in the medical records I reviewed, which were accompanied by the profound side effects produced by the powerful medications which he ingested on a daily basis, I believe that he was unable to perform the regular and customary duties of his occupation in international commercial real estate at least as early as August 7, 2006, the date Mr. Friedman departed from his job."

(AR P00598 and P00600).

### The Essential Facts Establishing Ed Friedman's Impairment

The sad and compelling truth about Mr. Friedman's disability is that it has been manifesting itself over the past few years in ways which were obvious to the people around him. Chronic lightheadedness, severe fatigue, chest pain, mental confusion, fainting, falling down and uncontrolled diarrhea have unfortunately become typical, daily problems for Mr. Friedman.

Joseph Rader, the Chief Operating Officer at Newmark Knight Frank, who had continuing close contact with Mr. Friedman while he still was employed there, relates his own personal observations:

> "In January of 2006, Ed's physical appearance began to change. He no longer seemed to have any color in his face or neck area. I also noticed, on a few occasions, that Ed did not walk at his usual brisk pace; instead, his walk was sluggish and labored. Ed's unhealthy appearance and

> slowed movements continued until he left Newmark in
> August 2006.
>
> Also beginning in January 2006, I noticed that Ed had
> become forgetful. I would have occasion to ask him about
> the status of one or another of his projects, and he would
> forget the broker's name, for example. As I have always
> known Ed to have a tremendous memory, the onset of such
> occasional forgetfulness caused me concern. I observed Ed
> somewhat more closely over the next 7 months and Ed's
> memory lapse has continued to occur."

(AR P00619 and P00620).

Other people in Mr. Friedman's life were witness to his steady deterioration. For

example, Jessica Tierno, also of Newmark Knight Frank related her own observations:

> "In November and December of 2005, I attended meetings
> with Ed and noticed unusual behavior. While we were both
> seated, Ed's head would slowly drop forward and then
> suddenly snap back, startling both of us. I saw this happen
> between 8-10 times. When I asked if he was ill, Ed told me
> that it was due to the medication he was taking."

(AR P00621).

Similarly, Jessica Tierno relates a specific recollection while clearing through

security at a Detroit airport with Mr. Friedman:

> "While we were still in the security area, we each found a
> seat so that we could put our shoes back on. I was leaning
> forward somewhat, still attending to my shoes, but Ed had
> finished. I saw him stand up and then suddenly pitch
> forward. As he was going down to the floor, his hands shot
> out from his sides and he slowed his landing somewhat. I
> watched as Ed rolled over, took a few heavy breaths, and
> then climbed back into the chair. I asked Ed if he was sick
> and he said he just had a "gray out."
>
> About 15 minutes after Ed fell, we sat together in one of
> the airport's restaurants to wait for our flight. When we
> were getting ready to leave, I saw that when he stood up,
> Ed began to sway. He grabbed one arm of the chair with
> one hand and the edge of the table with the other to prevent

> himself from falling again and then he sat back down
> again."

(AR P00622).

Mr. Friedman's Administrative Assistant, Elizabeth Ann Gilbert, also related her

frightening observations of Mr. Friedman's physical decline:

> "Beginning in February of 2006, I noticed that Mr.
> Friedman's appearance had changed.  His skin was
> unusually pale and perspiration was now visible on his
> forehead.  I also noticed that he did not stand up the way he
> used to.  Instead, he would put both palms flat on his
> desktop, look down, and slowly rise until he was upright.
> If he wasn't seated at his desk, he would hold onto the arms
> of a chair and push up until he stood.  Mr. Friedman does
> not look as though he was steady on his feet for a few
> minutes after he would rise from a chair.  I also noticed that
> Mr. Friedman looked and moved as if he were exhausted
> no matter what time of day it was.  This lack of energy and
> focus was not at all what I had seen during my first months
> working for him."

(AR P00625).

Indeed, by the Spring of 2006, Mr. Friedman's condition had deteriorated to such

an extent that he would require that Ms. Gilbert hold his calls for at least one hour a day

so that he could rest.  She also related incidents where Mr. Friedman's Ulcerative Colitis

and Diarrhea caused him many incidents of embarrassment and interrupted his daily

activities regularly by the Spring of 2006.

(AR P00626).

Even more compelling is the information related by Yee Cent Wong who knows

Ed better than anyone.  She relates her own compelling account of Mr. Friedman's

physical decline:

> "I personally witnessed Ed begin to fall from a standing
> position between 60-75 times.  At these times, Ed would

grab onto whatever was nearby - - a wall, a handrail, a countertop, just to keep himself from falling. Many times, I was nearest to him so he held onto me for support. We began to refer to these episodes as "gray outs" because Ed did not lose consciousness as a person would if he or she "blacked out". Instead, he felt lightheaded, dizzy, and his focus blurred. Ed experienced gray outs outside in the street, in his apartment, in my apartment, in public places. Ed was quite upset and embarrassed when this happened to him, especially when other people were able to see him in such a vulnerable state.

\*\*\*

In the last 18 months alone, I have witnessed Ed experiencing a minimum of 60 of these two types of near-falling occurrences, which are referred to by Ed's physicians as Near-Syncope episodes.

\*\*\*

From early Winter of 2005 through to the present day, Ed began to frequently experience "the chills", regardless of the season, weather, or temperature. Without warning, Ed's teeth chatter and his whole body shivers as if from the cold.

\*\*\*

Because of the unpredictable frequency and occurrence of Ed's symptoms, we have curtailed the majority of the social activities we once enjoyed so regularly.

\*\*\*

Ed's attendance at family gatherings or informal get-togethers with our friends is never certain because neither he, nor I, know if he will have enough strength."

(AR P00630, AR P00631, AR P00631, AR P00632 and AR P00632).

Ed Friedman himself has related the impact his illness and its treatment had on his ability to function:

"When I began taking Toprol, I noticed the side effects within the first three days. I was uncharacteristically slow and sluggish, seemed to lose my focus while others were speaking, and felt unsteady on my feet. As time went by more symptoms appeared and their severity and frequency also increased. These included: crushing fatigue, lack of focus, diarrhea, loss of memory, and a sickly physical appearance which made everyone around me ill at ease and noticeably concerned. From the end of 2005 through

7

> August 2006, such side effects were uncontrollable. I didn't
> know from one minute to the next what symptom would hit
> or how hard.

(AR P00592 and AR P00593).

The evidence from those in a position to know, conclusively establishes the severe nature of Mr. Friedman's illness, and the many ways in which it manifests itself and disables him. On this record, there can be no credible contention that Mr. Friedman's restrictions and limitations have not been documented. His inability to perform the material and substantial duties of his high powered, stressful and demanding occupation is plain to see.

### *Mr. Friedman's LTD Claim*

By the summer of 2006, Mr. Friedman's seriously deteriorating medical condition, and the heavy doses of Toprol he ingested daily to survive, were making it impossible for him to meet the demands of his high powered position at Newmark. As a result, Mr. Friedman was forced to apply for long term disability benefits under Newmark's Prudential Policy No. 90754, effective August 6, 2006.

On November 29, 2006, without conducting an Independent Medical Examination, and based only on a cursory, incomplete "records review" by a notorious defense medical hired gun named Dianne Zwicke, M.D., (AR P 00677) Prudential denied Mr. Friedman's claim for long term disability benefits under Group Policy No. 90754 (AR P00740 – AR P00746). Prudential summarily concluded "there is no medical documentation to support your inability to perform your own occupation" (AR P01043). It was thus clear from the very outset that Prudential had no intentions of paying this

8

large claim, regardless of the evidence. This became more and more apparent as the administrative review proceeded.

On May 31, 2007, Mr. Friedman availed himself of his administrative remedies and filed an exhaustive administrative appeal of the denial of long term disability benefits (AR P00674 - AR P00734). This appeal contained numerous, detailed sworn statements by Mr. Friedman's treating physicians, as well as other individuals who were witness to Mr. Friedman's tragic decline in health.

In response, Prudential continued in bad faith to refuse to honor its fiduciary responsibility to Mr. Friedman. It engaged in a biased, skewed analysis, which was grossly deficient, both substantively and procedurally, and seemingly designed to assure that Mr. Friedman would be denied his benefits. Notwithstanding, Prudential delayed the process to the maximum extent permitted under ERISA, to keep maximum financial pressure on Mr. Friedman.

Hence, rather than ask for an Independent Medical Examination to clinically assess Mr. Friedman's complex medical status, Prudential opted instead to hire another "paper reviewer," this by Eldred G. Zobl, M.D., an 81 year old retired hospital physician from Michigan, who repeated the same "analysis" as Dianne Zwicke, M.D., answered the same loaded questions as Dr. Zwicke, and, predictably, reached the same conclusion as Zwicke (AR P00404-P00409). Like Dr. Zwicke before him, Dr. Zobl failed to request an Independent Medical Examination, and failed to conduct any "peer to peer" communications with Mr. Friedman's treating physicians. Instead, Dr. Zobl chose to cite directly to Dr. Zwicke's report itself, upon which he obviously and extensively relied. (AR P000404 – AR P00409, AR P00740 – AR P00746)

9

***Unfortunately for Mr. Friedman, Prudential chose to conceal from Dr. Zobl all*** ***of the voluminous appeal materials submitted by Mr. Friedman on May 31, 2007!*** Hence, Dr. Zobl's review was based on the same materials upon which Dr. Zwicke purported to rely (AR P00404, P00740 and P00741), without ever seeing or considering the sworn and detailed, point-by-point rebuttal of Dr. Zwicke's cursory opinion, provided by Mr. Friedman's treating physicians, which provided the backbone of Mr. Friedman's claim.

Moreover, Dr. Zobl also was never shown and hence did not consider the detailed sworn statements of those who witnessed the day to day realities of Mr. Friedman's inability to perform the duties of his own occupation. Indeed, Dr. Zobl was never even given a copy of Mr. Friedman's job description! Incredibly, it is Dr. Zobl's opinion upon which Prudential ultimately relied in upholding the denial of benefits to Mr. Friedman. Given the fundamentally flawed process utilized by Prudential, there could be little doubt as to the outcome. To say that reliance on such an incomplete, biased analysis was arbitrary and capricious, is to understate.

The administrative review by Prudential was neither "full" nor "fair", and produced a benefits determination without any substantive foundation. Indeed, since most of the facts in the record are wholly unrebutted, the only way Prudential could have denied benefits, was to dishonestly ignore the record itself - - which it achieved by concealing from Dr. Zobl all of Mr. Friedman's appeal materials.

The decision to deny benefits in this case does not meet the "substantial evidence" requirement in this circuit, and constitutes a breach of fiduciary duty by Prudential. Prudential failed to properly investigate Mr. Friedman's claim, failed to consider his

treating physician's opinions, failed to communicate at all with Mr. Friedman's treating physicians, and failed to even have Mr. Friedman attend an Independent Medical Exam. There is *no* evidence, let alone "substantial evidence" to justify Prudential's determination in this case. Prudential's medical evidence consists of a cursory "records review" by hired insurance defense experts, who are not experts in this field of medicine, and who never even met Mr. Friedman, spoke to his treating physicians, or considered his administrative appeal materials.

In contrast, Mr. Friedman's treating physicians are world-renowned experts in their fields who have had the benefit of repeated clinical examinations and regular direct contact with the patient himself. ***Significantly, Prudential has never contested Mr. Friedman's diagnosis of Dysautonomia, nor the contention that this incurable disease can and does disable Mr. Friedman. Rather than contest the diagnosis, Prudential chose to ignore it.***

Instead, Prudential disingenuously requested that Mr. Friedman submit to a battery of unlimited, unsupervised personality testing, purportedly to assess his "cognitive" functioning (AR P01031 – AR P01033). In reality, Prudential hoped to obtain a basis to allege "malingering" through a series of dubious, highly subjective personality tests, while conducting secret surveillance on Mr. Friedman before and after the testing (AR P01003). In retrospect, it is clear that the purported testing was a ruse to set up Mr. Friedman for surveillance (AR P01003). When Mr. Friedman pointed out that "confusion" and impaired memory were *not* component parts of his claim, Prudential voluntarily withdrew its request (AR P01012)[2].

---

[2] Prudential then dishonestly recorded in its claim file (but never advised Mr. Friedman) that Mr. Friedman had abandoned his claim that he was disabled from the side effects of his medication - - a complete

The reality is that Mr. Friedman's long term disability benefits under this policy will pay him only a small fraction of what he was already earning, and would in the future have earned at Newmark.  Hence, not only is there completely lacking any evidence of improper motive or secondary gain by Mr. Friedman, but in fact, he has every financial incentive to *avoid* disability and continue to earn at his prior substantial rate at Newmark.

In summary, Prudential has completely ignored its fiduciary duty to Mr. Friedman by engaging in a substantively and procedurally flawed analysis of his claim which virtually guaranteed a denial of benefits.  When Mr. Friedman availed himself of his administrative appellate remedies by filing a detailed recitation of the *bona fide* nature of his compelling disability, Prudential simply looked the other way, and ignored it. Prudential's decision was arbitrary and capricious and must be reversed.

---

misrepresentation of the truth.  (See Affidavit of Michael E. Quiat in support of Motion for Summary Judgment).

## POINT I

### PLAINTIFF IS ENTITLED TO SUMMARY JUDGMENT UNDER RULE 56 FED. R. CIV. PRO. AND CASES DECIDED THEREUNDER

Summary judgment may be granted where it is shown that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. Pro. 56(c) see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The Court must view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in the non-movant's favor. See *Tufariello v. Long Island R.R. Co.*, 458 F. 3d 80, 85 (2d Cir. 2006). A party seeking summary judgment bears the burden of establishing that no genuine issue of material fact exists. See *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); see also *Segal v. City of New York*, 459 F. 3d 207, 211 (2d Cir. 2006). "Once the moving party has made a properly supported showing sufficient to suggest the absence of any genuine issue as to a material fact, the non-moving party, in order to defeat summary judgment, must come forward with evidence that would be sufficient to support a jury verdict in his favor." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F. 3d 14, 18 (2d Cir 1995). "The motion 'will not be defeated merely…on the basis of conjecture or surmise.' *Id.* Quoting *Bryant v. Maffucci*, 923 F. 2d 979, 982 (2d Cir. 1991); see also *McPherson v. N.Y. City Dep't of Educ.*, 457 F. 3d 211, 215 n. 4 (2d Cir. 2006) ("[S]peculation alone is insufficient to defeat a motion for summary judgment."). The materiality of the facts considered by the Court will be governed by substantive law. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). At summary judgment, the Court is not charged with weighing the evidence and determining its truth, but with determining whether there is a genuine issue

for trial.  See *Castro v. Metro. Transp. Auth.*, No. 04 CV 1445, 2006 WL 1418585, at *2

(S.D.N.Y. May 23, 2006); *Westinghouse Elec. Corp. v. N.Y. City Transit Auth.*, 735 F.

Supp. 1205, 1212 (S.D.N.Y. 1990).

Given the extent of uncontested facts in the record, as set forth in the

accompanying Statement of Uncontested Facts, it is clear the Plaintiff has met his burden

of proving, with substantial, unrebutted evidence, his entitlement to disability benefits

under the plan.  As such, the denial of benefits by Prudential in this case is "arbitrary and

capricious"[3] and must be overturned, and benefits awarded to Plaintiff, retroactive to his

date of disability.  *Miller v. United Welfare Fund*, 72 F. 3d 1066 (2d Cir. 1995); *Pagan v.*

*NYNEX Pension Plan*, 52 F. 3d 438 (2d Cir. 1995).

---

[3] It is Plaintiff's position that because of the gross substantive and procedural deficiencies in Prudential's handling of Mr. Friedman's claim, and its complete disregard for its fiduciary responsibilities to Mr. Friedman, this Court should review the denial of benefits on a *de novo* basis.  See *Nickels v. Prudential Insurance Co. of America*, 406 F. 3d 89 (2d Cir. 2005).  Notwithstanding, Plaintiff will argue in the alternative herein, that Prudential's conduct also must fail under the "arbitrary and capricious" standard, for the reasons more fully addressed in Points II and III.

## POINT II

### THE DENIAL OF BENEFITS TO PLAINTIFF WAS ARBITRARY AND CAPRICIOUS

The Supreme Court has held that a denial of benefits challenged under § 1132 (a)(1)(B) of ERISA is to be reviewed under a *de novo* standard unless the benefit plan gives the plan administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Tocker v. Phillip Morris Company, Inc.*, 470 F. 3d 481, 487 (2d Cir. 2006); *Nickels v. Prudential Insurance Company of America*, 406 F. 3d 98, 108 (2d Cir. 2005); *Loker v. Unum Life Insurance Company of America*, 389 F. 3d 288, 293 (2d Cir. 2004); *Muller v. First Unum Life Insurance Company*, 341 F. 3d 119, 123 (2d Cir. 2003); *Pagan v. NYNEX Pension Plan*, 52 F. 3d 438, 441 (2d Cir. 1995). Where the plan expressly provides discretion to the plan administrator to determine eligibility or construe the terms of the plan, then the benefits determination of the plan administrator will be reviewed, absent exigent circumstances, under an arbitrary and capricious standard of review. *New England Health Care Employees Union v. NLRB*, 448 F. 3d 189 (2d Cir. 2006); *Pagan v. NYNEX Pension Plan*, 52 F. 3d 438 (2d Cir. 1995); *Kinstler v. First Reliance Standard Life Insurance Company*, 181 F. 3d 243 (2d Cir. 1999).

Under the arbitrary and capricious standard of review, Courts are required to overturn a decision to deny benefits if the decision is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Pagan v. NYNEX Pension Plan*, 52 F. 3d at 442. "Where, as here, the entity making the claims determination is also the entity which must pay the claim if approved, the Courts apply a heightened standard of

scrutiny to these decisions. See, *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989); *Pagan v. NYNEX Pension Plan*, 52 F. 3d 438 (2d Cir. 1995).

Given the grant of discretion set forth in Prudential's Summary Plan Description ("SPD") (AR P00362), it appears that the Court will apply the arbitrary and capricious standard of review, while also considering the conflict of interest which exists herein.

Hence the first question for the Court on cross motions for summary judgment in this case is whether the decision to deny benefits in this case has a substantial evidentiary basis upon which the Court can rely. It is respectfully requested that there is no substantial basis for the denial of benefits in this case.

### 1. The "Peer Review" Reports of Drs. Zwicke and Zobl Are Clearly Biased and Disingenuous

The first claim evaluation by Prudential was based upon the records review of Dianne Zwicke, M.D., a notorious defense disability expert (AR P00677). Dr. Zwicke was asked only to opine on the disability status from a "cardiac perspective" (AR P00745). In concluding that Mr. Friedman was not impaired from a "cardiac perspective," Dr. Zwicke argued that there was no evidence in the record to support the nature of his complaints and that the medical records of his treating physicians did not support his claim (AR P00744). Conspicuously absent from her review was any request for an Independent Medical Examination, nor any attempt to discuss with Mr. Friedman's treating physicians, the nature of his illness.

Moreover, Dr. Zwicke's review of the medical record was selective at best and dishonest at worst. The medical records of Mr. Friedman's treating physicians are replete with numerous references to his symptoms and maladies. His crushing fatigue and weakness is well documented in the medical record (AR P00432, AR P00471, AR

P00520, AR P00522, AR P00596, AR P00809).  His continuing struggle with Irritable Bowel Syndrome, Ulcerative Colitis and uncontrolled Diarrhea is also amply documented throughout the medical records (AR P00433, AR P00481, AR P00510, AR P00596, AR P00818, AR P00819, AR P00820, AR P00822).  Similarly those records repeatedly refer to Mr. Friedman's dangerously erratic and irregular heartbeat (AR P00478, AR P00481, AR P00510, AR P00522, AR P00596, AR P00601, AR P00614, AR P00810, AR P00815, AR P00816, AR P00822, AR P00867, AR P00908, AR P00911 - AR P00913).

Moreover the assertion that Mr. Friedman's claim lacked objective medical evidence is false.  Clearly set forth within the record is an abnormal EKG (AR P00913), reference to an abnormal stress test (AR P00616), and multiple references to an electrophysiology examination and a positive Tilt Table Test (AR P00599, AR P00615), all of which objectively establish the nature of Mr. Friedman's impairment.  In addition, the Administrative Record also contains numerous sworn statements by third parties who witnessed and confirmed the debilitating symptoms which plague Mr. Friedman. *None of this evidence has been rebutted by Prudential.*

Dr. Zobl's "records review," conducted after Mr. Friedman filed his administrative appeal, was even more deficient.  First, it is clear that he relied extensively on Dr. Zwicke's report, which has been demonstrated to lack a valid evidentiary foundation in the record.

Moreover, Prudential selectively disclosed to Dr. Zobl only that information which it wanted him to consider when he affirmed Dr. Zwicke's view.  This, despite the blatantly false representation to Dr. Zobl by Prudential when it submitted the matter for his review, that: "All medical documentation contained with Mr. Friedman's file has been

provided for this review as well as all pertinent correspondence, telephone calls or other claim documentation" (AR P01027). Notwithstanding this representation, Prudential failed to provide Dr. Zobl with any of the substantive appeal materials submitted by Mr. Friedman:

- Prudential determined on its own, without any medical advice that the sworn statement of Dr. Gerald Bahr, Mr. Friedman's long time treating physician was not "pertinent" for Dr. Zobl's review (AR P00404 – AR P00409).

- Prudential determined without medical advice, that the sworn statement of Dr. Steven Zwiebel a long time treating physician of Mr. Friedman, was not "pertinent" for Dr. Zobl's consideration (AR P00404 – AR P00409).

- Prudential concluded without medical advice, that the sworn statement of Dr. Mark Gardenswartz was not "pertinent" to Dr. Zobl's consideration (AR P00404-P00409).

- Prudential chose not to provide the sworn statements of Barry Gosin, Joseph Rader, Jessica Tierno, Elizabeth Ann Gilbert, Yee Cent Wong and Mr. Friedman himself - - opining that this information was also not "pertinent" to Dr. Zobl's review (AR P00404 – AR P00409).

- Dr. Zobl was not given a job description for Mr. Friedman (AR P00404 – AR P00409).

Also, neither Dr. Zwicke nor Dr. Zobl were given the definition of disability as contained in the Prudential policy. Apparently, neither doctor was informed that Mr. Friedman was insured for his "own occupation" - - a critical component in any disability analysis (AR P00404 – AR P00409, AR P00740 – AR P00746).

18

In sum, to state that Prudential's decision to deny benefits in this case lacks substantial evidence to support it, is to state the obvious.

This is particularly true where, as here, Prudential has completely ignored the opinions of Mr. Friedman's treating physicians. See *Black and Decker Disability Plan v. Nord*, 538 U.S. 822, 833 (2003) ("Plan administrators of course, may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician."); *Stup v. Unum Life Insurance Company*, 390 F. 3d 301, 309 Note 5 (4th Cir. 2004) ("[Carrier] failed to adhere to the substantiality requirement by arbitrarily disregarding Plaintiff's reliable evidence, including the opinion of her treating physician, relying instead on ambiguous insubstantial evidence favoring [carrier's] own self interest."); *Quigley v. Unum Life Insurance Company of America*, 340 F. Sup. 2d 215, 223 (D. Conn. 2004) (Although an insurer has no duty to give a treating physician's opinion special weight, it must accept the opinion if there is no credible evidence suggesting that the treating physician's opinion is inappropriate").

The basis of Prudential's denial in this case is a cursory, and grossly incomplete "records review" by hired insurance defense experts who are not expert in the field of medicine at issue, and who never even met Mr. Friedman. In contrast, Mr. Friedman's treating physicians are world renowned experts in this field who have had the benefit of repeated clinical examinations and regular direct contact with the patient himself. (See Curriculum Vitae of Drs. Bahr, Zwiebel and Gardenswartz, AR P00634-P00648). Indeed, in order to accept Prudential's position as "reasonable," one would also have to conclude that all of Mr. Friedman's very prominent treating physicians, have essentially

chosen to conspire to falsely characterize Mr. Friedman's medical status. There is absolutely no basis in the record to even suggest such an absurdity.

### 2. Prudential Completely Ignored Mr. Friedman's Diagnosis and the Devastating Impact of His Toprol Medication

Prudential's denial of benefits also lacked substantial support as it failed to acknowledge, let alone address the nature of Mr. Friedman's illness, and the impact of his daily ingestion of Toprol-XL. Indeed, a review of the "peer reviews" of Drs. Zwicke and Zobl indicates that each fails to even acknowledge the existence of the Dysautonomia diagnosis, let alone refute it.

Similarly, both Dr. Zobl and Dr. Zwicke completely fail to address the contention that Mr. Friedman's daily ingestion of Toprol-XL in order to control his dangerously erratic heart rhythm, causes him crushing fatigue which, alone, would make it impossible for him to carry on in his substantial job responsibilities at Newmark (AR P00404 – AR P00409, AR P00740 – AR P00746). This, despite that fact that disability itself can be established solely as a result of side effects of medication. See e.g. _Torres v. Unum Life Insurance Company of America_, 405 F. 3d 670, 678 (8th Cir. 2005) (Insurer had an obligation to address the side effects of necessary medications.); see also, _Gaither v. Aetna Life Insurance Company_, 394 F. 3d 792, 806 (10th Cir. 2004) (Insurer improperly rejected claimant's claim that he was disabled as a result of the side effects of medication)[4].

---

[4] To the extent Prudential purports to rely on the alleged lack of "objective" medical evidence of Mr. Friedman's crushing fatigue, it is incorrect both factually and legally. The record reflects the observations of numerous people who witnessed first hand the impact of fatigue and weakness on his ability to do his job. (AR P00617 – AR P00633. Moreover, the Courts have repeatedly held that it is improper to demand objective test results to establish inherently subjective complaints of pain and fatigue. See e.g. _Mitchell v. Eastman Kodak Co._, 133 F. 3d 433 (3d Cir. 1997); _Abram v. Cargill_, 395 F. 3d 882 (8th Cir. 2005).

Here, Plaintiff's paper reviewers never even addressed the issue of the side effects of the medication on Mr. Friedman, even though those side effects are well known and well documented in the medical literature (AR P00605 – AR P00613)

### 3. *Prudential Failed to Fulfill its Responsibilities as a Fiduciary*

Given Prudential's obvious refusal to consider the pertinent evidence available to support Mr. Friedman's claim, indeed considering its active attempts to ignore the evidence, it seems clear that Prudential has breached its fiduciary duties to Mr. Friedman under ERISA. *Donovan v. Bierwirth*, 680 F. 2d 263 (2d Cir. 1982); *Devlin v. Empire Blue Cross & Blue Shield*, 274 F. 3d 76 (2d Cir. 2001). As a fiduciary, Prudential has "a duty to deal fairly and honestly with its beneficiaries." *Ballone v. Eastman Kodak Co.*, 109 F. 3d 117, 124 (2d Cir. 1997). Moreover, as Judge Henry Friendly apply noted in *Donovan v. Bierwirth*, Supra:

> **"A fiduciary must discharge his duties 'solely in the interest of the participants and beneficiaries'. He must do this for 'the exclusive purpose' of providing benefits to them**. And he must comply 'with the care, skill, prudence, and diligence under the circumstances then prevailing' of the traditional 'prudent man.' (Emphasis added).

*Donovan v. Bierwirth*, 680 F. 2d 263 at 271.

Moreover, fiduciary obligations to plan participants and beneficiaries are those of trustees of an express trust - - the highest known to the law. *Donovan v. Bierwirth*, 680 F. 2d 272 at Note 8. A fiduciary's decisions must be made "with an eye single to the interest of the participants and beneficiaries." *Re: Statement of Trust Second*, Section 170 (1959); *II Scott on Trusts*, Section 170, 1297 to 1299 (1967) citing cases and

21

authorities; *Bogert, The Law of Trusts and Trustees*, Section 543 (2nd Edition 1978) all as cited in *Donovan v. Bierwirth* at 680 F. 2d 271.

Given these legal standards, there is no question that Prudential's conduct constitutes much more than simply a breach of contract. Rather, Prudential has flagrantly disregarded its fiduciary obligations to Mr. Friedman, with intent, to his great and substantial detriment.

In sum, the denial of benefits on this record is arbitrary and capricious as a matter of law. Mr. Friedman has conclusively demonstrated that he is entitled to benefits as he meets the definition of the plan terms. The decision to deny benefits must be reversed and Mr. Friedman must be rewarded benefits retroactive to his date of disability. *Rappa v. Connecticut General Life Ins. Co.*, 2007 WL 4373949 (E.D.N.Y.) ("Where the decision to deny benefits is unreasonable because it was not based upon substantial evidence...reversal, rather than remand, is appropriate. See *Zervos v. Verizon N.Y., Inc.*, 277 F. 3d 635, 648 (2d Cir. 2002); *Zuckerbrod v. Phoenix Mutual Life Ins. Co.*, 78 F. 3d 46, 51 No. 4 (3d Cir. 1996)").

22

### POINT III
### PLAINTIFF WAS DENIED A
### FULL AND FAIR REVIEW

ERISA explicitly requires employee benefit plans to afford a reasonable opportunity to any participant whose claim for benefits has been denied, for a full and fair review by the appropriate named fiduciary of the decision denying that claim. *Aetna Health Insurance, Inc. v. Davila*, 542 U.S. 200 (2004); *Servos v. Verizon New York, Inc.*, 277 F. 3d 65 (2d Cir. 2002). The Department of Labor has promulgated regulations pursuant to ERISA that set forth the particular procedures administrators must undertake in order to provide a full and fair review. See, *Black & Decker Disability Plan v. Nord*, 538 U.S. 825 (2003); *Eastman Kodak Company v. Coyne*, 452 F. 3d 215, 221 (2d Cir. 2006). In order to comply with ERISA's mandated full and fair review, these regulations require that plans providing disability benefits must:

> Provide claimants the opportunity to provide written comments, documents, records, and other information relating to the claim for benefits...[and] provide for a review that takes into account all comments, documents, records, and other information submitted by the claimant relating to the claim, without regard to whether such information was submitted or considered in the initial benefit determination.

29 C.F.R. § 2560.503-1(h)(2)(ii)-(iii).

At its heart, the full and fair review requirement includes knowing what evidence the decision-maker relied upon, having the opportunity to address the accuracy and reliability of that evidence, *and having the decision-maker consider the evidence presented by both parties prior to reaching and rendering his decision. Atkins v. Park Place Entertainment Corp.*, 2008 WL 820040 (E.D.N.Y. 2008), *Cejaj v. Building Services 32B-J Health Fund*, 2004 WL 414834 (S.D.N.Y.). The plan fiduciary is

23

required to consider any and all pertinent information available to him. In regard to this requirement, the decision maker is required to consider the evidence presented by both parties prior to reaching and rendering a decision. *Meely v. Pension Trust of the Pension Hospitalization and Benefit Plan of the Electrical Industry*, 2004 WL 2851792 (E.D.N.Y.); *Morasco v. Bridgestone Firestone, Inc.*, 2006 WL 354980 (E.D.N.Y.) ("A full and fair review necessitates considering all comments, documents, records and other information submitted by the claimant relating to the claim."); 29 C.F.R. § 2560.503-1(h)(2)(iv). Moreover, any evidence of a conflict of interest is a factor which must be weighed in determining whether there has been an abuse of discretion. *Pulvers v. First Unum Life Insurance Company*, 210 F. 3d 89 (2d Cir. 2000).

In this case, Prudential, seemingly by design, has failed utterly in providing Plaintiff a full and fair review of his disability claim, and hence the denial of benefits is arbitrary and capricious and must be reversed.

### 1. *Prudential Failed to Consider the Information Submitted by Plaintiff*

As a review of the Administrative Record reflects, the bulk of the information which supported Mr. Friedman's disability claim is contained in his administrative appeal, which was filed with Prudential on May 31, 2007 (AR P00674 – AR P00734). **Notwithstanding, none of the information submitted by Mr. Friedman at that time was reviewed by any physician consultant on behalf of Prudential**. Indeed, it appears that that material was specifically *excluded* from consideration by the physician consultants (AR P00404 – AR P00409, AR P00422 – AR P00424, AR P00740 – AR P00746).

Moreover, as a review of the denial letter from Tim Routh reflects (AR P1016-P1021), he neither acknowledges nor attempts to explain how the decision Prudential reached is consistent with the materials submitted by Mr. Friedman as part of his administrative appeal. This is a clear violation of 29 C.F.R. § 2560.503-1(h)(3)(iv).

Further, not only did Prudential fail to consider the competent evidence before it in support of Mr. Friedman's claim, nor supply that information to its physician consultant, but Prudential also "cherry picked" information from the record which supported its decision, and ignored everything else in the record. *Spangler v. Lockheed Martin Energy Systems*, 313 F. 3d 356 (6th Cir. 2002). See also, *Moon v. Unum Provident Corporation*, 405 F. 3d 373 (6th Cir. 2004); *DeDios Cortes v. MetLife, Inc.*, 122 F. Sup. 2d 121 (D.P.R. 2000) (Where carrier disregarded evidence produced by claimant's treating physicians and instead chose to rely selectively on parts of the opinions of non-treating physicians, denial was arbitrary and capricious).

### 2. Prudential Failed to Address or Consider the Grueling Requirements of Plaintiff's Job

Equally significant and objectionable is the apparent failure of Prudential to consider or address the grueling job requirements which Mr. Friedman had at Newmark. Though Prudential does not dispute the evidence submitted by the Plaintiff which establishes the highly demanding nature of Mr. Friedman's work, specifically including his need to travel extensively (AR P00009, AR P00010, AR P00018, AR P00276 – AR P00277, AR P00280, AR P00310, AR P00322, AR P00585 – AR P00588, AR P00590, AR P00593, AR P00598 – AR P00599, AR P00619, AR P00622, AR P00624 – AR P00626, AR P00630), Prudential nevertheless fails to explain how he can meet those job requirements given his current restrictions and limitations. It appears from reading the

25

peer review of Dr. Zobl, as well as the denial letter from Tim Routh (AR P1016-P1021), that no consideration whatsoever was given to the highly demanding job requirements of Mr. Friedman's position and no attempt was made to explain how he could continue to fulfill those job requirements given his physical limitations.   Instead, in Mr. Routh's letter, he engages in a meaningless recitation of DOT Code: 189-117-034, yet fails completely to connect that generic information to the facts of Mr. Friedman's case (AR P01020 - AR P01021).

Consideration of the specific requirements of Plaintiff's job is a necessary element in a full and fair review under the terms of ERISA. *Viglietta v. Metropolitan Life Insurance Company*, 2005 WL 5253336 (S.D.N.Y.); *Peterson v. Continental Casualty Company*, 77 F. Supp. 2d 420, 426-428 (S.D.N.Y. 1999) (Decision to deny benefits is arbitrary and capricious where administrator did not include any mention of the travel or strenuous activity related to claimant's primary position.).

As the Court in *Viglietta* explained: "If Plaintiff is correct that MetLife did not consider the correct job description, then any conclusions they drew as to Plaintiff's ability to perform his job would necessarily be arbitrary and capricious."   2005 WL 5253336 (S.D.N.Y.).

Moreover, to the extent that Prudential now claims that it did consider these items, the failure to reflect same in the record is fatal. *Viglietta v. Metropolitan Life Insurance Company*, 2005 WL 5253336 (S.D.N.Y.) ("MetLife claims that [it] did consider Plaintiff's true job description in accessing his appeal.   However, there is no record evidence to support that conclusion.   If MetLife and its medical consultant did

26

review the correct job description, it was their responsibility to make that fact clear in their denial letter.")

### 3. Prudential Failed to Reconcile Conflicting Medical Opinions

Clearly, by failing to provide all medical evidence in support of Mr. Friedman's claims to Dr. Zobl for a review, Prudential skewed, in bad faith, the result which flowed from its "review" of his appeal.

Indeed, in his denial letter, Tim Routh fails to even acknowledge the discrepancy between the conclusory assertions of Dr. Zobl and the detailed opinions of Mr. Friedman's treating physicians. This too violates the requirement of a full and fair review. _Dzidzovic v. Building Service 32B-J Health Fund_, 2006 WL 2266501 (S.D.N.Y.) (Full and fair review denied where administrator failed to explain why it has chosen to credit certain pieces of medical evidence over others. The administrator is required to explain how and why it reconciled the reports from Plaintiff's treating physicians, who diagnosed Plaintiff as permanently and completely disabled, with the reports from their own expert.); _Giraldo v. Building Service 32B-J Pension Fund_, 2006 WL 380455 (S.D.N.Y.) ("At the very minimum, to fulfill their obligations of conducting a full and fair review, Defendant was obligated to explain "why they found one medical opinion more credible than another, directly conflicting opinion."); see also, _Cejaj v. Building Serive 32B-J Health Fund_, 2004 WL 414834 (S.D.N.Y.)

Obviously, no such analysis was undertaken in the instant case. It is understandable why Dr. Zobl would not have done so since he was totally unaware of the information submitted by Mr. Friedman on appeal. However, Mr. Routh of Prudential was fully familiar with all of the information that had been submitted by Mr. Friedman,

and could not have been unaware of the diametrically opposed positions and conclusions reached by Mr. Friedman's treating physicians, when compared to the opinions of Drs. Zwicke and Zobl.    Notwithstanding, he failed to address or even acknowledge this conflict, let alone attempt to reconcile it.  This could not have been inadvertent.

This is particularly important given the fact that Prudential failed to conduct an Independent Medical Exam of Mr. Friedman, and failed to even contact those physicians to engage in a "peer to peer" discussion about the case.  Obviously, Mr. Friedman's treating physicians were in a much better position to evaluate his condition by virtue of their continuing contact and personal clinical observations of Mr. Friedman throughout the relevant time period.  Prudential requested and availed itself of no such opportunity, yet it credited its own physician reviewers opinions without explaining or even considering the opinions of Mr. Friedman's treating physicians.  *Black & Decker Disability Plan v. Nord*, 538 U.S. 822 (2003) (Opinions of treating physicians cannot be ignored.); *Rappa v. Connecticut General Life Insurance Company*, 2007 WL 4373949 (E.D.N.Y.) (Where records reviewer does not address contrary opinions of treating physicians, and instead simply answers loaded questions from the carrier, such an opinion does not constitute substantive evidence).

### 4. Prudential Failed to Consider or Address the Impact of Medication on Mr. Friedman's condition

Despite the evidence in the Administrative Record provided by Mr. Friedman as to the massive doses of Toprol-XL which he takes regularly in order to control his dangerously erratic heartbeat, and despite the well documented side effects of such medication, neither Dr. Zobl nor Dr. Zwicke nor Tim Routh even addressed this issue, let alone explain why it alone does not disable Mr. Friedman.  See e.g. *Torres v. Unum Life*

*Insurance Company of America*, 405 F. 3d 670 (678) (8th Cir. 2005) (Insurer had an obligation to address the side effects of necessary medications); see also, *Gaither v. Aetna Life Insurance Company*, 394 F. 3d 792 (806) (10th Cir. 2004) (Insurer improperly rejected claimant's assertion that he was disabled as a result of the side effects of medication).

Where, as here, important medical information is provided by the Plaintiff which legitimately establishes an independent basis for disability, Plaintiff's failure to consider or address it is itself arbitrary and capricious and deprived Plaintiff of a full and fair review.

### 5. *Prudential Failed to Consider Mr. Friedman's Subjective Complaints*

Dr. Zobl contends that the medical record in this case does not provide objective evidence to support the claims of Mr. Friedman (AR P00407). Putting aside for the moment that this conclusion is factually incorrect (AR P00407), Dr. Zobl and Prudential were also required to consider the subjective complaints of Mr. Friedman which are well documented in the medical records, and contained in the appellate materials filed by Mr. Friedman on May 31, 2007. Of course, Dr. Zobl never saw those materials, and Prudential simply ignored them. In this Circuit, it is well established that these subjective complaints of a claimant must be considered and, absent evidence to the contrary, must be credited. See *Connors v. Connecticut General Life Insurance Company*, 272 F. 3d 127, 136 (2d Cir. 2001).

### 6. *Prudential Failed to do a Comorbidity Analysis*

As part of Prudential's faulty review which deprived Mr. Friedman of benefits to which he is entitled as a matter of law, Prudential failed to do a proper comorbidity

analysis, by failing to address Mr. Friedman's conditions in aggregate. *Abram v. Cargill*, 395 F. 3d 882 (8th Cir. 2005); *Torgeson v. Unum Life Insurance Company of America*, 466 F. Supp. 2d 1096 (N.D.I. 2006). In this way, Prudential was able to isolate the component parts of Mr. Friedman's claim, and conclude that none of the individual components, alone, was disabling.

Of course, Prudential failed to consider the *aggregate* impact on Mr. Friedman of all of the conditions which flow from his established diagnosis of Dysautonomia. As a fiduciary, Prudential was required to do much better.

For all the reasons set forth above Mr. Friedman was denied a full and fair review of his claim as required by ERISA and the DOL Regulations promulgated thereunder. Under these egregious circumstances, Defendant's decision should not only be reversed, but this Court should also place Plaintiff on claim, and order his benefits paid retroactive to his date of disability, August 6, 2006.

There is more than ample, unrebutted evidence already in the record to establish Plaintiff's disability, as it is defined by Prudential's policy. To deny that Mr. Friedman meets the policy definition of disability is to deny the evidence. A remand for further claim review by Prudential would just mean further delay, to Prudential's benefit and Plaintiff's severe detriment. Prudential has already had its contractual opportunity to properly evaluate the evidence. It has not done so. It should not be rewarded by granting it a "do-over" to Mr. Friedman's great and substantial harm.

30

## CONCLUSION

Wherefore for all the reasons set forth herein, the decision of Prudential to deny Mr. Friedman long term disability benefits under Newmark and Company Real Estate, Inc.'s Policy No. DG-90754-NY should be reversed, and Plaintiff should be awarded benefits retroactive to August 6, 2006, his effective date of disability, plus interest.

Respectfully submitted,

USCHER, QUIAT, USCHER & RUSSO
A Professional Corporation
433 Hackensack Avenue
Hackensack, NJ 07601
201-342-7100

Dated: April 15, 2008            By:     /s/ Michael E. Quiat
                                         MICHAEL E. QUIAT (MEQ-8238)
                                         **Attorneys for Plaintiff,**
                                         **Edward A. Friedman**

G:\Disability\Friedman\Summary Judgment\Brief.doc

31