UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EDWARD A. FRIEDMAN,<br><br>Plaintiff,<br><br>vs.<br><br>PRUDENTIAL INSURANCE COMPANY OF AMERICA,<br><br>Defendant. | Civil Action No.:07-CIV-9620(SHS)<br><br>**STATEMENT OF<br>UNDISPUTED FACTS** |

Pursuant to the Local Civil Rules of the United States District Courts for the Eastern and Southern Districts of New York, Rule 56.1, Defendant Prudential Insurance Company of America, submits the following Statement of Undisputed Facts:

                                      MORGAN, LEWIS & BOCKIUS LLP
                                      Attorneys for Defendant

Dated: Philadelphia, Pennsylvania
       April 15, 2008                    By: /s/ Jeremy P. Blumenfeld
                                              Jeremy P. Blumenfeld, Esq.

## STATEMENT OF UNDISPUTED MATERIAL FACTS[1]

### A.   Plaintiff's Medical History

1.     In or about 2000, Plaintiff, who was born on October 5, 1959, came under the care of Dr. Gerald S. Bahr, an internist, At or about that time, Dr. Bahr commenced treating Plaintiff with Asacol for ulcerative colitis. (P01275-P01278).

2.     In 2001, Plaintiff informed Dr. Bahr that he was suffering from an irregular heart rate. Dr. Bahr ordered a stress test which indicated that Plaintiff's heart rate reached 134 beats per minute within the first minute of exercise and remained in the range of 120 beats per minute for more than 20 minutes. (*Id.*).

3.     Dr. Bahr referred Plaintiff to Dr. Steven Zweibel, a cardiologist and electrophysiologist, for further treatment and a determination as to the cause of this condition. *(Id.)*.

4.     In or about October 2001, Plaintiff commenced treatment with Dr. Zweibel. On or about November 5, 2001, Dr. Zweibel, proscribed 25 mg per day of

---

[1]   Plaintiff's counsel has provided the Court with a complete set of the Administrative Record considered by Prudential in its review of Plaintiff's claim for LTD Benefits. It is our understanding that documents Bates Stamp Numbered P0001-P0328 constitute the Administrative Record as it existed on September 26, 2006 and as provided by Prudential to Plaintiff's counsel. Documents Bates Stamp Numbered P0329 through P1061 constitute the Administrative Record as it existed on September 13, 2007 and as provided by Prudential to Plaintiff's counsel. Documents Bates Stamp Numbered P1062-P1999 constitute Prudential's Initial Disclosures as provided to Plaintiff's counsel in this litigation on February 27, 2008 and include the entire Administrative Record as well as the Group Contract, Certificate of Coverage and Summary Plan Description  For ease of reference and to minimize duplication, Prudential will refer to pages of the Administrative Record in its Initial Disclosures (P01062-P01999) throughout this Brief.

Toprol-XL, a beta blocker to address Plaintiff's heart rate. Four weeks later he increased the dosage to 50 mg per day. (P01286-P01288).

5. In July 2002, Dr. Zweibel conducted an electrophysiology ("EP") study of Plaintiff. While most of the findings were normal, it was noted that there was "inducible atrial fibrillation with atrial pacing at 160 ppm but no other inducible SVT." Dr. Zweibel also performed a Tilt-Table Test that reproduced near-syncope associated with brachycardia and hypotension. Overall, however, the EP study was determined to be normal. At that time, Plaintiff's existing prescription of 50 mg/day of Toprol was continued. (P01214-P01216). Plaintiff bought a Mio watch to monitor his heart rate. No other treatment was indicated. (*Id*).

6. In August 2003, Plaintiff began working for Newmark Real Estate ("Newmark") a commercial real estate company in New York City. Shortly after he commenced his employment, Plaintiff was named Executive Vice President, Brokerage & Advisory Services. He subsequently became a partner with the firm. The firm thereafter merged with another real estate company, Knight Frank, and is now known as Newmark Knight Frank. (P01261-P01262).

7. In March 2005 Plaintiff underwent a colonoscopy performed by Dr. Myron Goldberg, a gastroenterologist. The test was normal. There was no evidence of abnormalities, active irritable bowel syndrome or dysplasia. No further treatment or follow-up was recommended. (P01867-P01869, P01878).

8. In May 2005, Plaintiff was riding a JetSki when he had an accident and was stung by a jellyfish. (P01492). He went to Lenox Hill Hospital in New York City for

trauma evaluation. As part of the evaluation, CT Scans of the head, chest, abdomen and pelvis were performed. All of his vital organs were found to be normal except for a three-millimeter nodule discovered in his right lung. No treatment was recommended at that time although it was suggested that a six month follow up occur. (P01527-P01528).

9. Thereafter, Plaintiff had an echocardiogram ("echo") on January 12, 2006 which appeared to indicate that there was "thickened MV with mild myxomatous change and mild mitral regurgitation," but was otherwise normal. (P01446). In February 2006, Plaintiff also underwent a chest X-ray and CT-scan of his vital organs. Those examinations revealed a thyroid nodule, but otherwise, his vital organs, including his heart, lungs and bowel, were normal. (P01524-P01526, P01901). The CT scan found no evidence of the lung mass found in the CT Scan conducted at Lenox Hill Hospital in May 2005. (*Id.*).

10. Most of Plaintiff's medical records for the period of the Spring and Summer of 2006 relate to the discovery of the thyroid nodule and the diagnosis and possible treatment of same. The mass was tested. It was ultimately determined to be benign, but its rapid growth and Plaintiff's family history of thyroid disease led to the decision to remove the thyroid. This surgery was successfully performed on April 9, 2007. Plaintiff was placed on thyroid replacement therapy. No other treatment has been sought for the thyroid. (P01232-P01257, P01487-P01489, P01495, P01523, P01535).

11. Beginning in late 2006, Plaintiff's medical records focused on his cardiac complaints. In August, his primary care physician, Dr. Bahr, diagnosed Plaintiff with arrhythmia, ulcerative colitis and a thyroid mass. His office notes indicate that there was

an abnormal EP study and an abnormal colonoscopy. (P01823-P01829). However, the only EP study or colonoscopy are those described above all of which were normal. In September 2006, after Plaintiff had ceased working, Dr. Zweibel diagnosed Plaintiff with likely autonomic dysfunction, ulcerative colitis and sinus tachycardia. No objective bases for these diagnoses were provided. (P01338).

12.     Plaintiff's dosage of Toprol had been incrementally increased to 300 mg/day by 2005. There are no real-time records documenting the need for the increased Toprol dosage, or the symptoms that warranted the increase.

13.     Plaintiff's medical records do indicate that in 2006, Dr. Zweibel recommended that Plaintiff continue his 300 mg/day dosage of Toprol. He also recommended a Holter Monitor study. The Holter Monitor test was performed on September 14, 2006, again, after Plaintiff ceased working and claimed to be totally disabled. The results were normal. (P01212). One month later, Dr. Bahr increased Plaintiff's Toprol dosage to 350 mg/day. In February 2007, Plaintiff consulted Dr. Zweibel and an electrocardiogram ("EKG") was conducted. These test results were also normal. (P1211).

   B.   **Plaintiff's Claim for LTD Benefits and Procedural History**

       1.   **The initial claim**

14.     Plaintiff ceased his employment with Newmark on August 7, 2006. He applied for LTD Benefits on September 11, 2006 pursuant to Prudential LTD Policy G-90754 through his employment with Newmark. (P01990-P01991). The Plan's Elimination Period prior to eligibility for LTD benefits is 90 days,. (P01073).

15.  Under the LTD Policy at issue in this case:

You are disabled when **Prudential determines** (emphasis added) that:

- you are unable to perform the material and substantial duties of your regular occupation due to your sickness or injury; and
- you have a 20% or more loss in your indexed monthly earnings due to that sickness or injury. (emphasis removed) (P01086).

16.  The LTD Policy further defines "material and substantial duties" as those duties that:

- are normally required for the performance of your regular occupation; and
- cannot be reasonably omitted or modified, **except that if you are required to work on average in excess of 40 hours per week, Prudential will consider you able to perform that requirement if you are working or have the capacity to work 40 hours per week** (*Id.*)(emphasis added).
- 

17.  The LTD Policy further defines "regular occupation" to mean "the occupation you are routinely performing when your disability begins. Prudential will look at your occupation **as it is normally performed instead of how the work tasks are performed for a specific employer or at a specific location.**" (*Id.*)(emphasis added).

18.  In his Employee Statement submitted in support of his application for LTD Benefits, Plaintiff indicated that the conditions that disabled him were "fatigue, limited resistance, heart problems, worsening episodes of syncope, stomach problems, etc." (P01991).

19.  After obtaining Plaintiff's medical records from all of his identified healthcare providers, Prudential submitted those records for review to Diane Chase, RN.

After reviewing those medical records, Nurse Chase in a SOAP Note[2] dated October 26, 2006, indicated that Plaintiff had been diagnosed with sinus tachycardia in 2002 and that all his subsequent examinations and tests revealed normal findings with the exception of a Tilt-Table Test that reproduced near-syncope associated with hypotension and inappropriate brachycardia. She also noted that there did not seem to be any changes between the diagnosis in 2002 and the last day that Plaintiff was at work, and that there were no documented syncope episodes, shortness of breath with exertion, lightheadedness, nausea, or abnormal vital signs/examinations leading up to his last day at work. She also pointed out that Plaintiff's cardiology workup was largely normal and that the results of the Tilt-Table Test were controlled with medication. Similarly, there were no findings of gastroenterological problems following the 2005 colonoscopy or evidence of aggressive management of GI symptoms. (P01125-P01130).

20. During the initial claim determination process, Plaintiff's reports of a thyroid nodule, a lung mass, and anxiety also were examined. The thyroid nodule was noted to be monitored, but there were no apparent functional limitations because of it. The lung mass appeared to have resolved itself and needed no further treatment. Therefore, no limitations were caused by the lung mass. No mental health evaluation or medication had been recommended as a result of Plaintiff's reported anxiety. Therefore, it was determined that there was no documentation to support limitations caused by anxiety. (*Id.*).

---

[2]    SOAP is an acronym used by Prudential in its claim review process and stands for Subjective, Objective, Assessment, Plan.

1-PH/2893034.1

21. Based on its review of Plaintiff's medical records, Prudential by letter dated October 30, 2006, informed Plaintiff that it was denying his claim for LTD Benefits. In so doing, Prudential advised Plaintiff that there was no medical documentation to support his claim that he was unable to perform his regular occupation. (P01184-P01187).

22. It would appear that thereafter Plaintiff's cardiologist, Dr. Zweibel, contacted Prudential regarding its denial of Plaintiff's claim for LTD Benefits. On November 3, 2006, Dr. Zweibel spoke with Nurse Chase regarding Plaintiff. In a SOAP Note dated November 6, 2006, Nurse Chase recalled her conversation with Dr. Zweibel. In that conversation. Dr. Zweibel confirmed that he never witnessed Plaintiff have a syncopal episode except during a Tilt Table Test. However, at every visit both when he was working and after, with Dr. Zweibel, Plaintiff would report that he was dizzy and lightheaded. Furthermore, Plaintiff's co-workers purportedly witnessed incidents of Plaintiff's dizziness and lightheadedness while at the airport on one occasion. Dr. Zweibel indicated that the last time he saw Plaintiff, on October 31, 2006, Plaintiff complained that he was lightheaded and had chest pain. Dr., Zweibel indicated to Nurse Chase that he believed Plaintiff suffered from an autoimmune disease and recommended he see an immunologist. Dr. Zweibel, however, did not know if Plaintiff followed this recommendation. (P01133-P01134, P01197-P01198).

23. In that same SOAP Note, Nurse Chase noted that Plaintiff had unresolved symptoms of chest discomfort. However, the medical records in Prudential's possession from his healthcare providers, including Dr. Zweibel and Dr. Bahr, fail to indicate the

number of syncopal events except for the one time it was observed by Dr. Zweibel during the Tilt Table Test and a one time occurrence in the airport. Nurse Chase opined that based on the available medical records and her conversation with Dr. Zweibel it was unclear as to how the above conditions were continuing to impair Plaintiff. Based, however, upon her discussions with Prudential Medical Directors, Dr. LoCasio and Dr. Day, Nurse Chase recommended that Plaintiff's Medical Records be reviewed by an external reviewer. (*Id.*).

24,    Accordingly, on its own initiative, Prudential by letter dated November 6, 2006, submitted Plaintiff's claim for an independent medical review by a physician who specializes in cardiology. Prudential informed Plaintiff of same by letter dated November 6, 2006 and advised him that it would render a decision within 30 days. (P01178-P01179).

25.    During that time period, Dr. Bahr submitted a letter on Plaintiff's behalf, dated November 8, 2006. This letter asserted Dr. Bahr's contention that Plaintiff suffered from "a series of extremely serious medical challenges best described as a bundle of autonomic and compromised immune system issues." However, Dr. Bahr did not cite any medical evidence in support of his various diagnoses other than the fact that Plaintiff was on a high dosage of Toprol and complained of a laundry list of claimed symptoms. (P01334-P01335).

26.    An independent medical records review was performed by Dr. Dianne Zwicke, who is board certified in internal medicine and cardiovascular disease. (P01327-P01333) Dr. Zwicke concluded that Plaintiff's autonomic dysfunction was controlled by

the Toprol. While the dosage of 350 mg/day of Toprol was acknowledged to be high, Dr. Zwicke noticed that there was only one mention of sluggishness caused by the Toprol – in an office visit note dated October 4, 2006. There was no evidence that any substitute medication had been suggested or tried in an attempt to alleviate the claimed side effects of Toprol. Dr. Zwicke also noted that there was no demonstrated cardiac arrhythmia in any objective tests provided, and no treatment was given for sinus tachycardia. Dr. Zwicke further referenced the normal findings on the Holter Monitor test conducted by Dr. Zweibel on September 14, 2006. All bowel symptoms seemed to be controlled with medication, and no follow-up to the colonoscopy had been done, suggesting that these symptoms were stable. Dr. Zwicke concluded that the medical records did not provide sufficient documentation of functional limitations. (*Id.*).

27.    Prudential also requested a vocational review by Diana Turner, CRC, a vocational rehabilitation consultant. Ms. Turner reviewed Plaintiff's job description, employee statement, the OASYS occupational data program and the Dictionary of Occupational Titles. Through these sources, Ms. Turner concluded in a SOAP Note dated November 7, 2006, that the job title most closely associated with Plaintiff's regular occupation was Vice President. Her analysis stated that the job required the ability to work long hours, to make substantial travel, and to deal with intense pressure to succeed all of which Plaintiff claimed he incurred in his position with Newmark. (P01135-P01136).

28.    Based upon the medical records provided by Plaintiff's treating healthcare providers, including, without limitation, Dr. Bahr, Dr. Zweibel, Dr. Goldberg and his

endocrinologist, Dr. Szabo, the telephone discussion with Dr. Zweibel and the review of all of this information by Dr. Zwicke, Prudential by letter dated November 29, 2006 informed Plaintiff that it was denying his claim as there was no medical documentation that he was unable to perform his own occupation. More specifically, Prudential noted that his autonomic dysfunction has been successfully treated with Toprol, his cardiac testing has come back revealing normal heart function, while he has a mild mitral regurgitation, he was asymptomatic and was not impaired, his lung mass had been resolved and the thyroid nodule was benign. As to the alleged side effects of Toprol, Prudential noted that there were no side effects reported except for a brief mention of sluggishness in an Office Visit Note with Dr. Bahr on October 4, 2006. (P01173-P01176).

    2.    **Plaintiff's Appeal**

29.    On or about May 31, 2007, Plaintiff, through his attorney, Michael Quiat, Esq., appealed the initial claim denial. In support of his appeal, Plaintiff provided additional medical information, including Certifications from his various healthcare providers regarding his purported medical condition as well as statements from Plaintiff's co-workers, supervisors and his significant other as to their observations of Plaintiff. (P01270-P01326).

30.    In the appeal, Plaintiff's counsel noted that since the denial of his claim he was diagnosed by Dr. Alcibiades Rodriguez, a neurologist, with Obstructive Sleep

Apnea.[3] (P01217-P01219). In addition, Plaintiff's counsel indicated that Plaintiff had consulted with Dr. Mark Gardenswartz, an Internist and Nephrologist, who diagnosed Plaintiff with Dysautonomia, a disorder of the Autonomic Nervous System. (P01270-P01274). Plaintiff's counsel also claimed that his client also purportedly suffered from glaucoma in addition to his other allegedly disabling conditions.

31. Further and updated medical records were requested by Prudential as part of the appeals process from all of Plaintiff's healthcare providers, including Dr. Gardenswartz, Dr. Rodriguez. and Dr. Laura Cozzarelli, Plaintiff's ophthalmologist who diagnosed him with glaucoma. (P01554-P01569).

32. In addition, a neuropsychological independent medical examination ("IME") of Plaintiff was requested in order to evaluate Plaintiff's claim of disability due to mental confusion and short term memory loss as a result of high-dose Toprol. (P01166-P01167). Plaintiff conceded that his symptoms of mental confusion and short term memory loss were not disabling and Prudential agreed to waive the neuropsychological IME on Plaintiff's request. (P01160-P01161, P01226).

33. During the appeal process, two more independent medical records evaluations were requested by Prudential. (P01155-P01158). The first was performed by Dr. Richard N. Silverstein, who is board certified in ophthalmology. Dr. Silverstein examined Plaintiff's complaints of limitations caused by glaucoma. Dr. Silverstein in a

---

[3] In his Report dated March 23, 2007, Dr. Rodriguez indicated that Plaintiff had "Probable Obstructive Sleep Apnea. He further indicated in his Report that Plaintiff "works in his own business and does some consulting work". He later amended his Report on April 3, 2007 to indicate that Plaintiff had a mild degree Obstructive Sleep Apnea. (P01231).

report dated July 20, 2007 opined that the records suggested no functional impairments or visual impairments from the glaucoma. (P01208-P01210).

34.     The second medical records review was performed by Dr. Eldred Zobl, who is board certified in cardiology. Dr. Zobl opined in a report dated August 7, 2007 that there was no report of abnormal findings during the Holter Monitor test, that there had been a normal EP study, that the echo had found mild mitral regurgitation but was otherwise normal, and that there was a normal EKG. Dr. Zobl did note the abnormal Tilt-Table Test conducted in 2002, but could not draw any conclusions because the results of the test and accompanying vital signs were not described. (P01202-P01207).

35.     Thereafter, by letter dated August 28, 2007, Prudential informed Plaintiff that it was upholding its prior decision to deny his claim. Prudential indicated in its letter that based upon the review of all of the available medical records by its independent medical doctors there was nothing documented in Plaintiff's medical records which would preclude him from being able to perform the material and substantial duties of his regular occupation. (P01147-P01152).