USCHER, QUIAT, USCHER & RUSSO
A Professional Corporation
433 Hackensack Avenue, 2nd Floor
Hackensack, NJ 07601
201-342-7100
**Attorneys for Plaintiff**
**Edward A. Friedman**

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

| | |
|---|---|
| EDWARD A. FRIEDMAN, | Civil Action No. 07cv9620-SHS-AJP |
| Plaintiff, | |
| - against - | ECF CASE |
| PRUDENTIAL INSURANCE COMPANY OF AMERICA, | PLAINTIFF'S LOCAL RULE 56.1 STATEMENT OF UNCONTESTED FACTS |
| Defendant. | |

*Uncontested Personal Facts*

1. Plaintiff is a 48 year old commercial real estate professional. (AR P00675)

2. Plaintiff is a graduate of Columbia University and Columbia University Law School. (AR P00675)

3. Plaintiff was, until disability, a principal in the international commercial real estate firm of Newmark Knight Frank, formerly known as Newmark & Company Real Estate, Inc. (hereinafter referred to as "Newmark"). Plaintiff was Executive Vice President (EVP) at Newmark in charge of global brokerage and advisory services. (AR P00675)

4. Plaintiff's base salary was $275,000.00 per year. Plaintiff also received incentive compensation which paid him $500,000.00 per year. Plaintiff was an equity owner in the firm of Newmark and stood to realize millions of dollars in ownership interest as the company expanded. (AR P00675)

5. Plaintiff is a beneficiary of Newmark & Company Real Estate, Inc.'s Long Term Disability Plan, which is insured by Prudential Insurance Company of America, Group Policy No. DG-90754-NY, (hereinafter "the Plan"). (AR P00331, AR P00334 – AR P00339)

6. Under the terms of the Plan, Plaintiff is insured in the event of disability which is defined as the "Inability to perform the material and substantial duties of your regular occupation due to sickness or injury." (AR P00340)

7. Under the terms of the Plan, Plaintiff is entitled to receive benefits of 60% of his prior monthly earnings, up to a maximum of $12,000.00 per month. (AR P00340)

8. Because of Plaintiff's income level, he is entitled to the maximum monthly benefit available under the Plan, which is $12,000.00. (AR P00340)

9. The $12,000.00 monthly benefit is less than one third (1/3) of Plaintiff's prior monthly earnings. (AR P00675)

### *Uncontested Employment Facts*

10. Plaintiff began his career with Newmark when Newmark's business was confined within the borders of the continental United States, with offices in New York, Georgia, California, Texas, Illinois and Washington, D.C. (AR P00587, AR P00590)

11. Early in his tenure with the company Plaintiff advanced to the position of EVP, Brokerage & Advisory Services; a short time later, he was invited to become a Principal of the firm. (AR P00587)

12. Plaintiff advocated and directed Newmark's rapid expansion into the global commercial real estate brokerage industry. (AR P00587)

13. Newmark became a powerhouse firm with an enormous worldwide market share, soaring profits, and a current staff of over 5,300 professionals. (AR P00587)

14. Throughout most of 2005, Newmark and Knight Frank were involved with the formation of a partnership. (AR P00588)

15. The arduous process of uniting these two firms was of paramount importance and required constant attention from Mr. Friedman. (AR P00588)

16. He simultaneously served as both the lead negotiator on Newmark's behalf and also supervised the due diligence team -- in addition to performing his regular and customary duties as an EVP and Principal. (AR P00588)

17. It was not unusual for Plaintiff to work between 75-80 hours per week during this, and other periods of time, during his years at Newmark. (AR P00588)

18. A significant portion of Plaintiff's job was spent scouting and recruiting talented brokers from rival firms to join his staff at Newmark. (AR P00588)

19. Once mutual interest was established, it was Plaintiff's responsibility to negotiate each new professional's contract with Newmark. (AR P00588)

20. The rule, rather than the exception, was that these negotiations were as complex as they were challenging, involving territorial assignments, benefits, and bonus incentive plans. (AR P00588)

21. The day-to-day operation of Newmark's global brokerage staff was wholly under Plaintiff's direction and control. (AR P00589)

22. Plaintiff made all the determinations as concerned which broker was authorized to pitch a specific piece of business within a given territory; he also removed brokers from choice assignments when they underperformed to company standards. (AR P00589)

23. Plaintiff had to continuously monitor each broker's performance to ensure these matches were successful for clients and Newmark. (AR P00589)

24. Frequently, disputes would break out – over commissions, territorial encroachments, or perceived inequality of some sort -- and Plaintiff would be called to quell the noise and quickly determine who was to receive whatever was sought. (AR P00589)

25. Oftentimes, Plaintiff stood between two rival brokers as threats of physical harm and shouted accusations passed between them. (AR P00589)

26. Plaintiff was able to introduce and implement many successful policies and systemic upgrades intended to streamline information between colleagues and subordinates -- all of which Newmark employed to great success. (AR P00589)

27. Plaintiff instituted the integrated knowledge management program, a system which united disparate databases and detailed data which, when utilized properly, produced a 'whole picture' when accessed by the user. (AR P00589)

28. Plaintiff also introduced broker debriefing reports, which culled current, freshly retrieved information from a broker and deposited it into the database for immediate access by colleagues. (AR P00589)

29. Plaintiff introduced and maintained annual professional development groups, where the newest Newmark brokers were provided intensive training one night every other week. (AR P00590)

30. Plaintiff personally provided the bulk of this essential training for them, while standing, within a classroom setting – complete with white board, laser pointer, and podium. (AR P00590)

31. Plaintiff was required to travel frequently on behalf of Newmark's national and international interests and expansion plans. (AR P00590)

32. Domestically, from New York, Plaintiff frequently traveled to and from: Florida, Michigan, Connecticut, and Arizona. (AR P00590)

33. Internationally, Plaintiff frequently traveled to Great Britain, and also to India, Hong Kong, Singapore, Thailand. (AR P00590, P00599, P00624, P00630).

34. Under Plaintiff's direction, Newmark opened additional offices in the U.S. and more than ten cities in South America and Central America. (AR P00590)

35. Prior to the onset of the first symptoms of Plaintiff's heart condition, Plaintiff lived a physically active life. (AR P00591)

36. In the early mornings, it was Plaintiff's longstanding habit to jog and continue his training in martial arts. (AR P00591)

37. Plaintiff played as much tennis, football and basketball as his discretionary time would allow, whether he was at home in Manhattan or traveling on behalf of Newmark. (AR P00591)

38. In addition to the simple enjoyment each activity brought, Plaintiff also believed it was essential to exercise regularly in order to live a long life. (AR P00591)

39. Prior to his disability, Plaintiff averaged 13-16 hour work days in the office or while traveling. (AR P00695)

40. Plaintiff would generally arrive in the office by 7:00 a.m., and would rarely leave the office before 8:00 p.m. (AR P00695)

41. During the course of a typical day, Plaintiff initiated or responded to 50 to 60 telephone calls and between 175 to 200 email messages. (AR P00695)

42. He reviewed financially complex commercial real estate contract proposals throughout the course of a typical day. (AR P00696)

### *Uncontested Medical Facts*

43. In the early spring of 2002 Plaintiff began to experience physical symptoms which he had not previously experienced. (AR P00591)

44. When he walked at his regular pace, he became winded and had to stop and catch his breath. When he slowed his walk he found that even at the slower pace he would have to stop and rest. Mr. Friedman also began to have difficulty walking up or down inclines, like stairs or ramps. He became weak and unstable on his feet. (AR P00591)

45. His heart rate became erratic, wildly racing at one moment, then precipitously dropping the next. (AR P00591)

46. Eventually, Plaintiff consulted his primary care physician Dr. Gerald Bahr. The results of a stress test performed on Mr. Friedman in October 2002 noted that (a) Mr. Friedman's heart rate quickly reached 134 bpm within the first minute of exercise; and (b) his heart rate remained in the 120 bpm range for more than 20 minutes. Dr. Bahr then

referred him to Dr. Steven Zweibel, a noted Cardiologist and Electrophysiologist. (AR P00591, AR P00601, AR P00614, AR P00615)

47. Dr. Zweibel conducted an electrophysiology test and directed that Plaintiff undergo a Tilt-Table Test on July 21, 2002. (AR P00615). These tests confirmed that Plaintiff had Near-Syncope, associated Hypotension and Inappropriate Sinus Tachycardia, that he was not a candidate for ablation, and that these conditions might be caused by an underlying case of some type of autonomic dysfunction. (AR P00614 – AR P0616)

48. Plaintiff has long suffered with ulcerative colitis. (AR P00596, AR P00691)

49. As part of the treatment plan to help manage this condition, Plaintiff was prescribed Asacol. (AR P00601)

50. The many side effects associated with Asacol are well documented and include: headache, flu-like symptoms, sweating, difficulty falling asleep, nausea, vomiting, and confusion. (AR P00601)

51. In addition, Plaintiff has been ingesting Toprol-XL for approximately seven years to control his dangerously elevated heart rate. (AR P00603, AR P00615)

52. Daily dosages of Toprol-XL prescribed for Plaintiff began at 50 mg and were incrementally increased to 300 mg in the winter of 2005. (AR P00603, AR P00615).

53. This beta-blocker medication, intended to provide a measure of stability for Plaintiff's irregular heart rates, is well known to cause a number of significant side effects. (AR P00603, AR P00615, AR P00616)

54. The side effects that have plagued Plaintiff, include lightheadedness, dizziness, shortness of breath with minimal exertion, and extreme fatigue. (AR P00603, AR P00615, AR P00616)

55. The high dosage of Toprol-XL ingested by Plaintiff each day, now at a rate of 350 mg each day, is likely to be a primary cause of each of these disabling symptoms. (AR P00603, AR P00615, AR P00616)

56. The purpose of the Toprol, as indicated in Dr. Zweibel's clinical notes of August 9, 2002, was to suppress Mr. Friedman's inappropriate and dangerous heart rate response. (AR P00615)

57. The Toprol medication has had a profound impact on Plaintiff's ability to function in his work. (AR P00591, AR P00592, AR P00602, AR P00616)

58. Mr. Friedman must continue to take massive doses of Toprol daily in order to survive. (AR P00603).

59. Even without any other medical problems the Toprol which Plaintiff ingests daily to stay alive is sufficient to disable him. (AR P0060, AR P00603, AR P00615, AR P00616).

60. The diagnosis of dysautonomia, a recognized disorder characterized by the occurrence of autonomic dysfunctional symptomology, is supported primarily by Plaintiff's history of documented syncope and near-syncope, inappropriate sinus tachycardia, and arrhythmia. (AR P00597)

61. Autonomic dysfunction, an alternate term for dysautonomia, was initially considered and recorded in Dr. Zweibel's office notes of October 22, 2001. (AR P00598)

62. The medical records since that time indicates consistent documentation in the progression of the symptoms which support the diagnosis of dysautonomia. (AR P00598 – AR P00599, AR P00601 – AR P00602, AR P00614 – AR P00616)

63. Indeed, autonomic dysfunction appears time and again in Dr. Zweibel's notes as being a possible cause of his symptomology. (AR P00004, AR P00010, AR P00015, AR P00023 – AR P00025, AR P00075 – AR P00077, AR P00079 – AR P00087, AR P 00093 – AR P00096, AR P00138, AR P00142, AR P00147 – AR P00153, AR P00438 – AR P00440, AR P00450 – AR P00458, AR P00476 – AR P00478, AR P00598 – AR P00599)

64. There is no known cure for dysautonomia. (AR P00598, AR P00602)

65. Dysautonomia can be quite debilitating, particularly in a case like Plaintiff's, where his occupation required extraordinary energy, drive, and cognitive facility, at all times. (AR P00598)

66. To simply walk through an airport concourse with his luggage to his departure gate, poses severe challenges to someone like Plaintiff. (AR P00599)

67. At any moment, Plaintiff might experience an episode of syncope and fall, which would, of course, unnecessarily increase his risk of physical injury and harm. (AR P00599)

68. The exertion required by purposeful walking, all by itself, could very well prompt his heart rate to increase to an unsafe range. He would have to stop, catch his breath, and rest until his heart rate stabilized. (AR P00599)

69. Mr. Friedman is unable to travel as he once did on behalf of his company. (AR P00599)

70. There is no way to predict when Plaintiff's symptoms – whether from dysautonomia or as side effects of his medication – will strike. (AR P00592, AR P00599)

71. Plaintiff cannot prevent these symptomatic episodes, either. Plaintiff is left only to limit, as much as is possible, the amount and frequency of exertional activities. (AR P00599)

72. As a result of his dysautonomia and the massive ingestion of Toprol daily, Plaintiff was forced to eliminate over time many of the discretionary physical activities in which he had previously engaged, because they invariably resulted in frightening rapid fire heart rate episodes, or because of the extreme fatigue which pervaded his life daily. (AR P00599)

73. By the end of 2005, Plaintiff no longer jogged or engaged in any martial arts or sports activities. (AR P00592)

74. Plaintiff suffers from uncontrolled diarrhea. He took steps to avoid unplanned accidents, by refusing to eat or drink at certain times of the day, particularly before meetings. (AR P00592)

75. Plaintiff also arranged for dinner meetings to be conducted at restaurants near his office so that he could obtain his choice table near the men's room. (AR P00592)

76. Plaintiff kept extra pairs of underwear and pants in his office to deal with unexpected and embarrassing accidents. (AR P00592)

***Uncontested Facts Regarding Prudential's Review and Denial
of Plaintiff's Claim for Long Term Disability Benefits***

77. Plaintiff's physical appearance deteriorated significantly in 2006. (AR P00592, AR P00593)

78. Throughout 2006, Plaintiff's fellow employees and superiors witnessed a multitude of incidents where Plaintiff experienced the many and varied symptoms caused by Dysautonomia. (AR P00617 – AR P000622, AR P000625, AR P00626)

79. These symptoms, witnessed by others, included Plaintiff's sickly physical appearance, flu-like symptoms, uncontrolled perspiration, and chills. (AR P00617 – AR P000622, AR P000625, AR P00626, ARP00628 – AR P00633)

80. These symptoms, witnessed by others, included numerous instances of "grey outs" or near fainting (syncope). These symptoms, witnessed by others, included pervasive and crushing fatigue. These symptoms, witnessed by others, included embarrassing incidents of uncontrolled diarrhea. (AR P00617 – AR P000622, AR P000625, AR P00626, ARP00628 – AR P00633)

81. These symptoms, witnessed by others, included falling asleep and regular napping during the course of the work day. (AR P00621, AR P00626)

82. In evaluating Plaintiff's claim for disability benefits, Prudential never requested or conducted an Independent Medical Exam of Plaintiff. (AR P00987 – AR P00989, AR P00995, AR P00996, AR P00998, AR P00999, AR P 01002 – AR P01011)

83. No one on behalf of Prudential has ever physically examined Plaintiff, at any time, up to the current time. (AR P00987 – AR P00989, AR P00995, AR P00996, AR P00998, AR P00999, AR P 01002 – AR P01011)

84. After Plaintiff appealed the initial denial of benefits by Prudential, Prudential requested that Plaintiff attend a neuropsychological examination by a forensic psychologist, purportedly to assess his memory and cognitive functioning. (AR P01012, AR P01031, AR P00133, AR P0137)

85. When Plaintiff explained to Prudential that Neuropsych testing was unnecessary since mental confusion and/or memory loss were not significant component parts of his disability claim, Prudential withdrew its request for a Neuropsych IME. (AR P01004)

86. In reality, Prudential intended to perform a multitude of personality tests to try to demonstrate malingering, and to set up secret surveillance of Mr. Friedman during the period of the neuropsychological evaluation. (AR P01003)

87. Plaintiff's condition of Dysautonomia is neurological in nature, but Prudential never had his claim evaluated by a neurologist or an expert on Dysautonomia or other autonomic disorders. (AR P00987 – AR P00989, AR P00995, AR P00996, AR P00998, AR P00999, AR P01002 – AR P01011)

88. At no time did any physician reviewer for Prudential ever seek a "peer to peer" with any of the Plaintiff's treating physicians, or seek to communicate with those treating physicians in any way. (AR P00404 – AR P00409, AR P00422 – AR P00424, AR P00740 – AR P00746).

89. Prudential's decision to deny benefits to Plaintiff was based exclusively on "records reviews" by its consultant physicians. (AR P00404 – AR P00409, AR P00422 – AR P00424, AR P00740 – AR P00746).

90. Prudential chose not to disclose to its physician consultants the materials provided in the exhaustive administrative appeal submitted by Mr. Friedman on May 31, 2007. (AR P00404 – AR P00409, AR P00422 – AR P00424, AR P00740 – AR P00746, AR P00674 – AR P00734)

91. Prudential chose not to disclose to its physician consultants the sworn statement of Mr. Friedman himself. (AR P00587 – AR P00593, AR P00404 – AR P00409, AR P00422 – AR P00424, AR P00740 – AR P00746).

92. Prudential chose not to disclose to its physician consultants the sworn statement of Plaintiff's treating physician Gerald S. Bahr, M.D. (AR P00601 – AR P00604, AR P00404 – AR P00409, AR P00422 – AR P00424, AR P00740 – AR P00746).

93. Prudential chose not to disclose to its physician consultants the sworn statement of Plaintiff's treating physician Steven L. Zweibel, M.D. (AR P00614 – AR P00616, AR P00404 – AR P00409, AR P00422 – AR P00424, AR P00740 – AR P00746)

94. Prudential chose not to disclose to its physician consultants the sworn statement of Plaintiff's treating physician Mark H. Gardenswartz, M.D. (AR P00596 – AR P00600, AR P00404 – AR P00409, AR P00422 – AR P00424, AR P00740 – AR P00746).

95. No physician consultant on behalf of Prudential has ever rebutted the sworn statements of Gerald S. Bahr, M.D., Steven L. Zweibel, M.D. or Mark H. Gardenswartz, M.D. (AR P00404 – AR P00409, AR P00422 – AR P00424, AR P00740 – AR P00746)

96. The sworn statements of Drs. Bahr, Zweibel and Gardenswartz stand unrebutted in the administrative record of this case. (AR P00601 – AR P00604, AR P00614 – AR P00616, AR P00596 – AR P00600)

97. Prudential chose not to disclose to its physician consultants the sworn statements submitted as part of Plaintiff's administrative appeal, from Barry M. Gosin,

Joseph I. Rader, Jessica Tierno, Elizabeth Ann Gilbert or Yee Cent Wong. (AR P00404 – AR P00409, AR P00422 – AR P00424, AR P00740 – AR P00746).

98. The sworn statements of Barry M. Gosin, Joseph I. Rader, Jessica Tierno, Elizabeth Ann Gilbert and Yee Cent Wong stand unrebutted in the administrative record of this case. (AR P00617 – AR P00618, AR P00619 – AR P00620, AR P00621 – AR P00623, AR P00624 – AR P00627, AR P00628 – AR P00633)

99. Prudential has not and does not contest Plaintiff's diagnosis of Dysautonomia. (AR P00596, AR P00598, AR P00600, AR P00602, AR P00616)

100. Prudential has not and does not contest that heavy doses of beta-blockers like Toprol-XL can disable a patient. (AR P00592, AR P00593, AR P00603, AR P00704 – AR P00712)

101. In its denial letter, Prudential has not and does not contest that Plaintiff is neurologically disabled. (AR P01016 – AR P0121)

102. In its denial letter, Prudential never addresses the impact of Toprol on Plaintiff's ability to perform his regular occupation. (AR P01016 – AR P01021)

103. In its denial letter, Prudential never addressed the extreme fatigue which plagues Plaintiff each and every day of his life. (AR P01016 – AR P01021)

104. Prudential has not and does not contest the highly demanding requirements of Plaintiff's occupation at Newmark. (AR P00009, AR P00018, AR P01016 – AR P01021, AR P00695 – AR P00696)

105. Prudential has never defined what occupational duties it contends Plaintiff can still perform. (AR P00009, AR P00018, AR P01016 – AR P01021, AR P00695 – AR P00696)

106. Prudential has never defined what occupational duties it contends Plaintiff cannot perform. (AR P00009, AR P00018, AR P01016 – AR P01021, AR P00695 – AR P00696)

107. Plaintiff's job description is unrebutted in the record. (AR P00009, AR P00018, AR P00695 – AR P00696)

108. Prudential has never acknowledged, disputed, or addressed the pervasive fatigue with which Plaintiff contends every day of his life. (AR P00009, AR P00010, AR P00016, AR P00587 – AR P00593, AR P00622, AR P00625, AR P00628 – AR P00633)

109. Prudential has never acknowledged, disputed or addressed the restrictions and limitations identified by Plaintiff's treating physicians. (AR P00004, AR P00016, AR P00021, AR P00596 – AR P00600, AR P00601 – AR P00604, AR P00614 – AR P00616)

USCHER, QUIAT, USCHER & RUSSO  
A Professional Corporation  
433 Hackensack Avenue, 2nd Floor  
Hackensack, NJ 07601  
201-342-7100

Dated: April 15, 2008    By:    /s/ Michael E. Quiat
MICHAEL E. QUIAT (MEQ-8238)
**Attorneys for Plaintiff**
**Edward A. Friedman**

G:\Disability\Friedman\Summary Judgment\Rule 56 - Uncontested Facts.doc